**LINCOLN BENEFIT LIFE COMPANY, a Nebraska Domestic Insurance Corporation, Plaintiff,**

v.

**Robert R. EDWARDS, Defendant.**

No. 4:CV95–3098.

United States District Court,
D. Nebraska.

March 24, 1997.

Gary J. Nedved, Keating, O'Gara, Davis & Nedved, P.C., Lincoln, NE, for plaintiff.

Rexford H. Caruthers, The Holloran Law Firm, St. Louis, MO, Murray Ogborn, Gelt, Fleishman, Sterling & Ogborn, Lincoln, NE, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KOPF, District Judge.

Following a bench trial on the issue of the statute of limitations[1], I now issue my findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a). For the reasons set forth below, I find and conclude that judgment pursuant to Federal Rule of Civil Procedure 54(b) should be entered for Defendant Robert R. Edwards on the issue of the statute of limitations.

## I. PROCEDURAL BACKGROUND

This action originated in the District Court of Lancaster County, Nebraska, as an action for declaratory judgment in which Plaintiff Lincoln Benefit Life Company ("LBL") alleged that Defendant Robert E. Edwards ("Edwards") owed LBL $452,558.29 pursuant to various agreements between LBL and Edwards. Pursuant to these agreements, Edwards, a marketing director for LBL, received overwriting commissions on insurance premiums received by LBL on insurance policies sold by agents who were assigned to Edwards and for whom Edwards was to

---

1. The court previously granted Plaintiff's motion for a bifurcated trial on the statute of limitations issue. (Filing 47.)

provide training, supervision, and administrative support. In exchange for such overwriting commissions, Edwards became responsible to LBL for indebtedness created by the agents assigned to him.

Pursuant to 28 U.S.C. §§ 1332(a), 1441, and 1446, Edwards filed a notice of removal of this action from state court to federal court (filing 1). In his answer and amended answer, filed on June 1, 1995, and September 29, 1995, respectively, Edwards asserts a counterclaim for, among other things, actual damages for breach of contract as shown by an accounting related to (1) LBL's undisclosed granting of higher and preferential commission rates to other marketing directors and (2) LBL's undisclosed assignment of agents in Edwards' geographic market area to other marketing directors. (Filing 15 at 4–13; Filing 24 at 6–16.) LBL raises the statute of limitations as an affirmative defense to Edwards' counterclaim. (Filing 43 at 2–3.)

## II. FINDINGS OF FACT

1. Plaintiff Lincoln Benefit Life Company ("LBL") is a Nebraska domestic insurance corporation with its home office in Lincoln, Nebraska. Defendant Robert R. Edwards ("Edwards") is a resident of Dallas, Texas. (Filing 63 at 3.)

2. Prior to 1982, LBL employed salaried regional vice presidents who were responsible for recruiting general agents through whom LBL marketed and sold its life insurance policies and annuity contracts. In 1982, LBL adopted a new marketing program and decided to replace these salaried regional vice presidents with independent, non-salaried, marketing directors who worked off commission and who had the resources to market and sell LBL's products through the appointment of general agents for LBL. (Tr. 195:20–197:8.) In an effort to "sell" this opportunity, LBL invited eight prospective marketing directors to Lincoln in 1982. (Tr. 197:25–198:23.) Edwards was one of these original eight marketing directors.

### The 1982 and 1984 Agreements

3. Effective February 1, 1982, LBL and Edwards entered into a Marketing Director Agreement pursuant to which Edwards agreed to engage in the marketing of insurance products and to recruit, train, supervise, motivate, retain, and provide administrative support for agents assigned to him in exchange for overwriting commissions. (Filing 63 at 3; Ex. 1 at 2.) This agreement gave Edwards the authority to "develop and supervise the company's business in conformity with the rules and regulations of the company" and assigned Edwards the responsibility to "recruit and recommend persons for appointment by the company as agents" and "train and supervise such agents in accordance with the standards of the company." (Ex. 1 at 2 (capitalization altered).)

4. The Marketing Director Agreement, under the printed heading entitled "Compensation," contained the following language:

The rate of overwriting commission payable as compensation to the marketing director may be amended at any time by written notice to the marketing director. Any amendment to such rate shall become effective on the date specified in the notice. An amendment, when made, shall apply only to insurance policies or annuity contracts accepted by the company on or after the effective date thereof. *No amendment shall be made unless a similar amendment is made to all other marketing directors' agreements between the company and other marketing directors.*

. . . .

The agent's statements rendered by the company concerning commissions paid and/or payable, advances and indebtedness shall be conclusive unless within thirty (30) days following receipt of the statement the marketing director notifies the company of a dispute regarding any transactions reported since the last preceding report.

(Filing 63 at 3; Ex. 1 at 2 (capitalization altered & emphasis added).)

Under the section of the agreement entitled "Indebtedness," Edwards was "responsible to the company for the acts and collections of his General Agents and for the indebtedness of his General Agents to the company." (Ex. 1 at 2 (capitalization altered).)

5. Pursuant to the language of the Marketing Director Agreement, Edwards was an "independent contractor," and not an "employee[ ] or servant[ ]." (Ex. 1 at 2.) The agreement bound Edwards to "exclusively represent the interest of the company" and to "not enter into any insurance sales agreements with other insurers or individuals, nor . . . engage in any competing activities on behalf of other insurers or individuals unless authorized to do so in writing by the company." (Ex. 1 at 2 (capitalization altered).)

6. Effective February 1, 1982, and contemporaneously with the Marketing Director Agreement, LBL and Edwards entered into a General Agent Agreement pursuant to which Edwards agreed to engage in the marketing of LBL's insurance products and to recruit, train, supervise, and provide administrative support for agents recruited by or assigned to Edwards in exchange for commissions as scheduled therein. This agreement also contained "independent contractor" and indebtedness provisions similar to those found in the Marketing Director Agreement. (Filing 63 at 3; Ex. 102.) This agreement allowed Edwards to write personal business and to receive commissions on that business under both the General Agent Agreement and the Marketing Director Agreement. (Tr. 109:16–110:3.)

7. In negotiating the 1982 Marketing Director Agreement with Edwards, LBL represented to Edwards that the Marketing Director Agreement would be the highest marketing appointment made within the company, which meant to Edwards that marketing directors would be paid at the top commission level possible. (Tr. 22:7–23.) During the 1982 negotiations, LBL also orally represented that it would not "compete" to recruit future agents in the marketing directors' geographical areas—the Dallas–Fort Worth area in Edwards' situation—and that LBL would assign all agents contracted by LBL located in Dallas–Fort Worth to Edwards. (Tr. 26:3–23; 29:18–23.)

8. Effective March 29, 1984, LBL and Edwards entered into a Master General Agent Agreement in which Edwards agreed to engage in the marketing of LBL's insurance products and to recruit, train, supervise, and provide administrative support for agents recruited by or assigned to Edwards in exchange for commissions as scheduled therein. The Master General Agent Agreement contained provisions that were substantially identical to those discussed in paragraphs (3), (4), and (5) above with regard to the Marketing Director Agreement. (Filing 63 at 3; Ex. 106.) This agreement allowed Edwards to write personal business at a commission rate higher than that provided in his General Agent Agreement, and to earn commissions under the Marketing Director Agreement. (Tr. 111:8–112:2.)

9. The above agreements were in full force and effect until LBL's termination of Edwards on February 21, 1995. (Tr. 110:4–23; 112:3–8.)

### The 30–Day Provision

10. The 30–day clause, referenced in paragraph (4) above, applied to agent commission statements, which LBL provided to Edwards bi-weekly, and later, weekly. Such statements documented all financial activities for a particular agent for a particular pay period, including commissions earned and "charged back," as when commissions for a year are advanced on a policy, but the policy is canceled before the year has passed. (Tr. 207:8–209:19.) If such "charge backs" exceeded an agent's commissions for a certain time period, LBL did not require the agent to pay the difference to LBL immediately, as LBL "anticipated . . . a continuing relationship with the agents, so there would be future commissions that could offset those amounts." (Tr. 210:14–211:7.)

11. If earned, a commission check from LBL would accompany such agent commission statements. (Tr. 209:20–23.) Edwards never refused to cash his commission checks, despite his contention that two other marketing directors were being paid at a higher commission rate than he was. (Tr. 222:1–4.)

12. Pursuant to a LBL marketing vice president's direction, this 30–day provision was not enforced at LBL from 1975 to 1987, and, in practice, the weekly agent commission statements were not considered to be

final and conclusive. (Tr. 369:7; 374:4–5; 382:1–18; 383:13–23.) If an agent called to point out a mistake in LBL's calculation of commissions, LBL would correct the mistake long after 30 days had elapsed, and, if asked, would tell marketing directors, including Edwards, that the 30–day provision would not be enforced. (Tr. 382:22–384:8.)

### Edwards' Duties for LBL

13. In order to carry out the terms of the above-described contracts in which Edwards agreed to recruit, train, and supervise agents in accordance with LBL standards, Edwards operated from his home on his own schedule, paying his own expenses, taxes, unemployment insurance, social security, and other withholding. As part of his business, Edwards met with potential agents "on behalf of Lincoln Benefit Life"; "carefully select[ed] agents that he wanted to represent himself and the company and to sell the company's products," with LBL having the ultimate right to approve or disapprove Edwards' selections; worked with LBL's marketing department in Lincoln, Nebraska, in order to recruit and train agents; and followed LBL's "requirements and rules." (Tr. 88:14–22; 89:18–90:1; 99:13–20; 101:1–102:11; 252:19–253:20.) Acting as "the front line of management for the company," LBL marketing directors "supervised the field activities of the company." (Tr. 201:5–8.)

14. When Edwards' subagents submitted insurance policy applications, such applications went directly to LBL, which processed and approved the policies and sent the policies directly to the subagents, who then delivered them to clients. Although Edwards' overwriting commissions were based on policy approval and premium payment, LBL did not, pursuant to its "original procedure" and "original instructions" to Edwards, furnish Edwards a list of policy applicants, approvals, or modifications. (Tr. 113:2–114:25; 115:16–116:4; 174:20–175:17.) As a result, Edwards could not determine from his own records the accuracy of LBL's determination of the amount of overwriting commissions to which Edwards was entitled in any given time period, as reflected by his commission statements. (Tr. 115:1–15; 116:11–21.) Ed-

wards understood from "the very beginning" that LBL would handle accounting functions. (Tr. 116:22–24.)

### New Marketing Strategy

15. In late 1984 or early 1985, LBL again changed marketing strategies and moved from a general agency system to a "life brokerage distribution system" whereby LBL would use nationally recognized marketing organizations that contracted with hundreds of agents instead of marketing directors. (Tr. 225:6–226:23.)

16. As a result of this change, all Marketing Director Agreements were canceled and changed to "MBA" contracts—or "Master Brokerage Agency" contracts—except the agreement with Edwards. (Tr. 226:24–228:21.) Upon advice from LBL's legal counsel, Edwards' Marketing Director Agreement was not changed to an "MBA" contract because repayment to LBL for Edwards' indebtedness situation, discussed in paragraph (29) below, was tied in part to his Marketing Director Agreement. (Tr. 228:4–12.)

### Preferential Commission Rates

17. Documents entitled "Marketing Director Schedule of Life Commissions," which were part of a January 1, 1984, commission schedule addendum to the Marketing Director Agreement, establish that Tony D. Weber and Leroy Liberda were receiving 12 percent more in commission on universal life products and one-half percent more on annuities than Edwards was receiving at that time. (Tr. 117:20–120:21; 121:8–126:21; Exs. 103 & 104.) Along with Edwards, Weber and Liberda were part of the original group of marketing directors appointed by LBL in 1982. (Tr. 31:18–20.)

18. Effective April 1, 1985, LBL entered into "Brokerage Marketing Director" contracts with Weber and Liberda in which Weber and Liberda were entitled to a 105–percent first-year commission on universal life insurance products, which was a higher commission rate than Edwards was receiving at that time. (Tr. 31:8–32:18; 33:18–22; 36:9–12; Exs. 2 & 3.) While not intended to be in writing, the Brokerage Marketing Di-

rector contracts with Weber and Liberda (Exs. 2 & 3) are an accurate statement of secret oral agreements between Weber, Liberda, and Bernard Eugene Wraith [2], who was at that time vice president of agencies with oversight of the marketing directors. (Tr. 234:13–236:8.) Wraith personally gave Weber and Liberda preferential commission rates as part of this oral arrangement in April or May 1985. Wraith told Weber and Liberda that the arrangement was to be kept strictly confidential, as are all employee salaries, and that "if someone found out about it, [Wraith] had every intention to discontinue it." (Tr. 230:8–232:8; 233:11–234:2.)

19. Edwards heard rumors at a September 1989 LBL marketing conference that Weber and Liberda were receiving a higher commission rate than Edwards was receiving. (Tr. 38:1–39:3; 39:24–41:21; Ex. 8.) Edwards then discussed his concerns about disparate commission rates with Wraith. After engaging in discussions with Edwards regarding the commission issue, and wanting to "buy some time" and to have a discussion document to show other officers of the company, Wraith directed Edwards to reduce his concerns to writing. (Tr. 240:7–18.) Wraith wanted Edwards to communicate with him in writing about this issue because Wraith "needed to talk to some other officers within the company about how much information we wanted to allow Mr. Edwards to have." (Tr. 242:6–9.)

20. On May 30, 1990, Edwards sent by facsimile to Wraith a collection of documents in which Edwards stated, "I now know Le Roy [Liberda] was receiving a 105% contract approximately one year before my [March 7, 1986,] contract was negotiated." (Ex. 4 at 9 ¶ 5; Tr. 62:15–20.) A "105% contract" meant that Liberda was receiving 10 percent above the standard amount of compensation for marketing directors. (Tr. 69:10–20.)

21. According to Wraith, LBL's reason for giving preferential commission rates to Weber and Liberda was that they were the only two former marketing directors LBL felt would succeed in LBL's new life brokerage marketing system, and the preferential rates were intended to help Weber and Li-

berda make the transition into this new marketing system. (Tr. 228:22–230:7.)

22. In 1991, Edwards and all master brokerage agents received a chart showing commission rates for various types of agents on various LBL products. The chart sent to Edwards showed "MBA" at a 95–percent rate—the highest rate—on certain universal life products. (Tr. 344:17–345:18; Ex. 117.) However, at that same time, Wraith prepared and kept "for [his] use only" another commission chart showing "BMD" as earning the highest commission on the same product, 105 percent, and "CA" as earning 100 percent. (Tr. 345:19–346:13; 346:23–347:9; Ex. 118.) Therefore, LBL's statement in a December 11, 1990, letter to Edwards that the MBA—master brokerage agent, replacing the marketing director designation—was the "highest contracted marketing position," was false. (Ex. 116; Tr. 346:14–18.) Wraith admits that LBL hired only two "BMDs" at that time—Weber and Liberda (Tr. 346:19–22)—and that he never intended the confidential commission chart to be sent or shown to Edwards (Tr. 348:9–17).

23. From the date Edwards' 1982 Marketing Director Agreement was executed until LBL terminated Edwards in 1995, LBL did not provide to Edwards any written information with respect to LBL's preferential commission arrangement with Weber and Liberda. (Tr. 106:7–12; 120:22–121:4.) While Wraith confirmed to Edwards within two weeks after Edwards' May 1990 facsimile to Wraith that Weber and Liberda were indeed receiving preferential commission rates, Wraith's confirmation was communicated in such a manner that Edwards was led to believe that the preferential commission rates were a result of an indebtedness situation similar to that involving Edwards, described in paragraph (29) below. (Tr. 39:15–19; 51:2–6; 68:3–8; 356:4–357:4.)

24. According to a former second vice president of LBL who was with the company from 1975 to 1987 and who was in charge of commissions during a portion of that time, if an agent called LBL asking whether they were receiving the highest possible commis-

---

2. Wraith is now president and chief operating officer of LBL. (Tr. 193:17–19.)

sion, the vice president "would probably have tried to be evasive about the situation, as discreet as I could be, without letting him know that there was a possibility that he didn't have the highest contract .... [j]ust so we did not discuss other people's contracts with other agents." (Tr. 369:16–17; 371:1–3; 421:10–422:9.)

25. No matter how closely Edwards scrutinized his records involving LBL, he would not have been able to tell that LBL had given a higher commission rate to Weber and Liberda. (Tr. 281:19–22 (testimony of Wraith).)

### Assignment of Agents and Indebtedness Agreement

26. As stated above, during the 1982 negotiations leading to Edwards' Marketing Director Agreement with LBL, LBL orally represented that it would assign all agents contracted by LBL located in Dallas–Fort Worth to Edwards. (Tr. 26:3–23; 29:18–23.) Wraith testified that he was not aware of such an agreement, and that LBL did assign agents in the Dallas–Fort Worth area to marketing directors other than Edwards. (Tr. 243:19–244:1.)

27. In December 1985 Edwards first became aware that LBL was not assigning all of its agents in the Dallas–Fort Worth area to Edwards. (Tr. 79:17–80:1.)

28. LBL notified Edwards when new agents were assigned to him, but LBL did not notify him if newly recruited agents within Edwards' geographical area were not assigned to him. (Tr. 116:25–117:8.)

29. Edwards met with Wraith, CEO and vice president of LBL; Fred Jonske, president of LBL; Ted Kessner, LBL attorney; and Doug Gaer, the LBL financial officer, in March 1986 to discuss LBL's assignment of agents to Edwards. As a result of this meeting, Edwards signed an agreement dated March 7, 1986, to pay LBL $433,100.72 plus interest resulting from indebtedness created in 1982 and 1983 by one of Edwards' subagents, Don Clark, d/b/a Prestige Investment Enterprises. "To assist Edwards to fulfill his obligation to LBL for the indebtedness," LBL also amended Edwards' Marketing Director Agreement by increasing his life commissions by five percent on existing brokers who were reassigned to Edwards, and by 10 percent on new brokers, and by increasing his annuity commissions by one-half percent on reassigned existing brokers, and by one percent on new brokers. These increases still did not surpass the commission rates assigned to Weber and Liberda. In exchange for Edwards' "good faith effort to pay the indebtedness," LBL also agreed to assist Edwards in recruitment of additional brokers in the Dallas–Fort Worth area and to assign such brokers to Edwards. (Tr. 143:1–147:21; Ex. 109.)

30. Edwards' indebtedness to LBL as a result of the Clark situation was not reflected in Edwards' weekly commission statements, but could have been calculated only by consulting "the individual subagent accounts," that is, statements of the agents who reported to Edwards. (Tr. 360:14–361:22.)

31. There were two incidents following the March 1986 agreement involving agents in Edwards' geographical area who were not assigned to Edwards. In each case, LBL and Edwards agreed to remove these two assignments from LBL's obligations under the March 1986 agreement and to pay Edwards overwrites in exchange. (Tr. 155:3–157:18.)

32. Edwards had conversations with Wraith about assignment of agents from 1985 until Edwards sent the May 30, 1990, facsimile to Wraith in which Edwards complained about "[b]rokers being assigned to new MBA's appointed in Dallas and Fort Worth with reduced or no overrides to Bob [Edwards]." (Tr. 84:14–17; 85:22–25; Ex. 4 at 9 ¶ 2.)

### Request for Accounting and Termination

33. Edwards made a formal written request to LBL for an accounting on January 23, 1994. (Ex. 5.) LBL denied Edwards' request by letter dated February 14, 1995. (Ex. 6.)

34. LBL terminated Edwards' Marketing Director, Master General Agent, and General Agent contracts "as of March 31, 1995" by letter dated February 21, 1995. (Ex. 7.)

LBL also filed a "Petition for Declaratory Judgment" against Edwards in the Lancaster County District Court on February 21, 1995, and Edwards filed a notice of removal in this court on March 15, 1995. (Filing 1.)

## III. CONCLUSIONS OF LAW

LBL argues that Edwards' claim for breach of the 1982 Marketing Director Agreement is barred by the applicable statutes of limitation, Neb.Rev.Stat. §§ 25–201 [3], 25–205 [4], and 25–206 [5] (Michie 1995), and Edwards argues that the statutes of limitation did not begin to run until the agency relationship between Edwards and LBL was terminated by LBL on February 21, 1995.

 "A cause of action accrues when the aggrieved party has the right to institute and maintain suit." *Central States Resources Corp. v. First Nat'l Bank*, 243 Neb. 538, 545, 501 N.W.2d 271, 276 (1993) (case analyzing when statute of limitations started to run when agency relationship existed between lead bank's successor in interest and purchaser of loan participation certificate).

> However, where there is a general or continuing agency, a statute of limitations does not commence to run until the agency is terminated, so that unless the death of one of the parties occurs, the termination of a continuing agency cannot be effective so as to set the statute in motion until an accounting is had or a demand for an accounting made and refused, or there is an express repudiation of agency communicated to the principal.

*Id.* A "general" agency is one in which an agent is "authorized to conduct a series of transactions involving a continuity of service." Restatement (Second) of Agency § 3 (1958).

Thus, the issue before me is whether there was a general or continuing agency relationship between Edwards and LBL such that

the applicable statutes of limitation did not begin to run until February 1995, the month in which Edwards' demand for an accounting was refused and in which LBL terminated the contractual relationship between it and Edwards.

In analyzing whether one is engaged in a principal-agent relationship with an insurer like LBL, the Nebraska Supreme Court has focused on the insurer's degree of control over the agent. *Moore v. Hartford Fire Ins. Co.*, 240 Neb. 195, 481 N.W.2d 196 (1992).

In *Moore v. Hartford Fire Ins. Co.*, the Nebraska Supreme Court held that an independent insurance agent who was licensed to sell insurance policies for six different companies and was paid on commission was not an agent of an insurance company when the insurance company did not control or direct the manner in which the agent operated. The court stated that "an insurance salesman who solicits business for more than one company, with no power to bind a specific insurer without its permission, and who is asked by the client to procure coverage from whomever possible at the lowest price, is not the agent of the insurer selected." *Id.*, 240 Neb. at 200, 481 N.W.2d at 200. *See also Double K, Inc. v. Scottsdale Ins., Co.*, 245 Neb. 712, 515 N.W.2d 416 (1994) (independent insurance agent who was not employed by any specific insurance company and who placed insurance with companies he selected was not agent of insurer)

In *Grone v. Lincoln Mutual Life Ins. Co.*, 230 Neb. 144, 430 N.W.2d 507 (1988), the Nebraska Supreme Court designated the relationship between the plaintiff and defendant insurance company as a fiduciary one of principal and agent when the plaintiff had entered into a general agent contract with the company and the agreement expressly forbade general agents from selling insur-

---

**3.** Neb.Rev.Stat. § 25–201 (Michie 1995) provides: "Civil actions can only be commenced within the time prescribed in this Chapter, after the cause of action shall have accrued."

**4.** Neb.Rev.Stat. § 25–205 (Michie 1995) provides in relevant part that "an action upon a specialty, or any agreement, contract, or promise in writing ... can only be brought within five years."

**5.** Neb.Rev.Stat. § 25–206 (Michie 1995) provides: "An action upon a contract, not in writing, expressed or implied, or an action upon a liability created by statute, other than a forfeiture or penalty, can only be brought within four years."

ance for other companies, despite the insurance company's informal authorization for its agents to act as agents for other companies when insurance sales for the other companies involved products that the defendant insurance company did not offer.

Outside the insurance context, the Nebraska Supreme Court has laid out several principles associated with the "control" analysis referred to above that are applicable in determining whether an agency relationship exists.

An agency is a fiduciary relationship resulting from one person's manifested consent that another may act on behalf and subject to the control of the person manifesting such consent, and further resulting from another's consent to so act. Whether an agency exists depends on the facts underlying the relationship of the parties irrespective of the words or terminology used by the parties to characterize or describe their relationship.

*Landmark Enters., Inc. v. M.I. Harrisburg Assocs.*, 250 Neb. 882, 886, 554 N.W.2d 119, 122 (1996) (citation omitted); *see also Franksen v. Crossroads Joint Venture*, 245 Neb. 863, 871, 515 N.W.2d 794, 801 (1994) (same); *Gottsch v. Bank of Stapleton*, 235 Neb. 816, 827, 458 N.W.2d 443, 451 (1990) (same); *Walker Land & Cattle Co. v. Daub*, 223 Neb. 343, 345, 389 N.W.2d 560, 563 (1986) (same); *Anderson v. Valley Feed Yards, Inc.*, 175 Neb. 719, 722–23, 123 N.W.2d 839, 842 (1963) (same).

■ " 'The distinguishing features of agency are its representative character and its derivative authority.' " *Anderson v. Valley Feed Yards, Inc.*, 175 Neb. at 722–23, 123 N.W.2d at 842 (quoting *Valentine Oil Co. v. Powers*, 157 Neb. 87, 91, 59 N.W.2d 160, 163 (1953)); *see also Gottsch v. Bank of Stapleton*, 235 Neb. at 827, 458 N.W.2d at 451 (same). An agent is one " 'authorized by another to act on his account and under his control.' " *Gottsch v. Bank of Stapleton*, 235 Neb. at 827, 458 N.W.2d at 451 (quoting *Valentine Oil Co. v. Powers*, 157 Neb. 87, 91, 59 N.W.2d 160, 163 (1953)). The court has also defined an agent as " 'one who acts for or in the place of another by authority from him; one who undertakes to transact some

business or manage some affairs for another by authority and on account of the latter, and to render an account of it.' " *Gottsch v. Bank of Stapleton*, 235 Neb. at 827, 458 N.W.2d at 451 (quoting *Watkins v. Waits*, 148 Neb. 543, 551, 28 N.W.2d 206, 210 (1947)).

## IV. ANALYSIS

### Control

■ As stated above, the pivotal inquiry in determining whether an agency relationship between Edwards and LBL existed is the degree of control LBL exercised over Edwards. The evidence in this case establishes that LBL had sufficient control over Edwards such that a general or continuing agency existed between Edwards and LBL until February 1995, the month in which Edwards' demand for an accounting was refused and in which LBL terminated the contractual relationship between it and Edwards.

Edwards' Marketing Director Agreement with LBL gave him the responsibility of continuously developing and supervising LBL's business, but only according to LBL's rules, regulations, and standards. This agreement strictly limited the scope of Edwards' insurance business, as the agreement barred him from entering into insurance sales agreements with any other insurer or individual, and from competing with LBL absent written permission from LBL.

While LBL did not control the manner in which Edwards physically conducted himself in performing his duties for LBL, LBL required that Edwards operate on behalf of Lincoln Benefit Life; that he be selective in appointing agents to represent LBL and to sell its products "in an admirable manner"; and that LBL maintain the ultimate right to approve or disapprove Edwards' agent selections. (Tr. 252:19–253:20.) As "supervis[ors of]" the field activities of the company," LBL considered Edwards and its other marketing directors "the front line of management for the company." (Tr. 201:5–8.) LBL obviously controlled the commission rate Edwards and its other marketing representatives earned, as well as agent assignment.

The current president and chief operating officer of LBL, Eugene Wraith, testified that LBL's policy of not requiring agents to immediately reimburse the company for "charged back" commissions is based on an "anticipated ... continuing relationship with the agents [such that] there would be future commissions that could offset those amounts." (Tr. 210:14–211:7.)

This is not a case of an independent agent who is authorized to sell insurance policies for several different insurance companies and who is asked by clients to procure coverage from whomever possible at the lowest price, as in *Moore v. Hartford Fire Ins. Co.*, 240 Neb. 195, 481 N.W.2d 196 (1992), and *Double K. Inc. v. Scottsdale Ins. Co.*, 245 Neb. 712, 515 N.W.2d 416 (1994), cases in which the Nebraska Supreme Court found no agency relationship between the independent agents and the insurance companies for whom the agents sold insurance. Rather, this is a case which more closely parallels *Grone v. Lincoln Mutual Life Ins. Co.*, 230 Neb. 144, 430 N.W.2d 507 (1988), in which the Nebraska Supreme Court designated the relationship between the plaintiff and defendant insurance company as a fiduciary one of principal and agent when the plaintiff had entered into a general agent contract with the company and the agreement expressly forbade general agents from selling insurance for other companies.

The evidence establishes LBL's consent, manifested by its agreements with Edwards and its policies, to Edwards acting on its behalf and subject to LBL's control, regardless of how the relationship between LBL and Edwards was labeled in the contracts at issue. *Landmark Enters., Inc. v. M.I. Harrisburg Assocs.*, 250 Neb. 882, 886, 554 N.W.2d 119, 122 (1996). LBL required Edwards to act as its representative, and Edwards derived authority to conduct a continuing series of business transactions on LBL's behalf from the relationship between the two. *Anderson v. Valley Feed Yards, Inc.*, 175 Neb. 719, 722–23, 123 N.W.2d 839, 842 (1963).

Therefore, a general or continuing agency relationship existed between Edwards and LBL until the relationship was terminated in February 1995, and the statutes of limitation did not begin to run until that relationship ended.[6]

### *Discovery*

Citing *Zion Wheel Baptist Church v. Herzog*, 249 Neb. 352, 543 N.W.2d 445

---

**6.** I note that the Nebraska Supreme Court has set forth a multi-factor test for determining whether one who acts on another's behalf acts as an independent contractor. In *Erspamer Advertising Co. v. Department of Labor*, 214 Neb. 68, 71–72, 333 N.W.2d 646, 648–49 (1983), the court adopted the ten-factor test for determining whether one is a *servant* or independent contractor contained in the Restatement (Second) of Agency § 220 (1958) in the context of determining whether an individual was an employee or an independent contractor for purposes of payment of unemployment benefits. The Nebraska Supreme Court later discarded this Restatement test in favor of Neb.Rev.Stat. § 48–604(5), which defines what services constitute "employment" for purposes of the Employment Security Law. *Commissioner of Labor v. Lyric Co., Inc.*, 224 Neb. 190, 193, 397 N.W.2d 32, 34 (1986).

Despite other language in the Restatement (Second) of Agency that clearly indicates that an independent contractor may also be an agent, Restatement (Second) of Agency §§ 2(3) (independent contractor "may or may not be an agent") & 14N, cmt. a (the term "independent contractor" is not antithetical to the word "agent"; most persons known as agents are also independent contractors because although they are employed to perform services, they are not

subject to control over their physical conduct in the performance of those services) (1958), the Nebraska Supreme Court expanded the Restatement's "servant-independent contractor" test, formerly used by the court in the unemployment compensation context, to be determinative in analyzing whether one is an *agent* or an independent contractor in other contexts. *Eden v. Spaulding*, 218 Neb. 799, 804, 359 N.W.2d 758, 762 (1984) (whether truck driver was independent contractor or agent of newspaper company for which he delivered newspapers); *Delicious Foods Co., Inc. v. Millard Warehouse, Inc.*, 244 Neb. 449, 456, 507 N.W.2d 631, 636 (1993) (whether refrigeration contractor was independent contractor or agent of cold storage warehouseman); *Fitzpatrick v. U.S. West, Inc.*, 246 Neb. 225, 230–31, 518 N.W.2d 107, 112 (1994) (whether public utility was independent contractor or agent of U.S. West when U.S. West hired public utility to reconnect electrical service to a building near an underground vault).

However, because I have determined that Edwards was an agent of LBL, and therefore the statutes of limitation did not begin to run until that relationship was terminated, I need not analyze whether Edwards was also an independent contractor under the multi-part test set forth by the Nebraska Supreme Court.

(1996)—a case involving Neb.Rev.Stat. § 25–222, which is the statute of limitations applicable to professional negligence actions and which contains an explicit discovery provision in its statutory language—LBL argues that because Edwards actually discovered that LBL was paying higher commission rates to Liberda and Weber more than five years prior to the filing of Edwards' counterclaim, the statutes of limitation began to run on Edwards' counterclaim from the time his cause of action was discovered or might have been discovered by the exercise of diligence. (LBL's Proposed Findings of Fact, Conclusions of Law and Trial Brief at 25–26.) Assuming for the sake of argument that this "discovery rule" applies, I disagree.

For all practical purposes, there was no way for Edwards to discover or confirm the existence of the higher commission rates LBL paid to Liberda and Weber or the circumstances under which such rates were given such that Edwards had grounds to dispute these rates.

LBL carefully and selectively controlled commission rate information, as evidenced by Wraith's desire to get Edwards' complaints about disparate commission rates in writing so that Wraith and other LBL officers could decide "how much information [LBL] wanted to allow Mr. Edwards to have." (Tr. 242:6–9.) LBL represented to Edwards that his position would be the highest marketing appointment made within LBL, yet LBL paid Liberda and Weber higher commission rates pursuant to an intentionally secret deal between LBL, Liberda, and Weber that was not intended to be committed to writing and was instead memorialized, to Wraith's knowledge, only on a commission chart prepared and kept for Wraith's private use.

Although LBL makes much of the fact that Edwards heard rumors about Liberda and Weber's preferential commission rates in 1989 and that Wraith confirmed these preferential rates, Wraith's confirmation was communicated to Edwards in such a manner that Edwards was led to believe that the preferential commission rates were a result of an indebtedness situation similar to that involving Edwards. Therefore, Edwards was not on notice of anything to dispute.

Even if Edwards exercised diligence in attempting to confirm his suspicions based on rumor through other sources besides Wraith, he could not have been successful. A former second vice president of LBL admitted that he would have been intentionally evasive if asked by an agent whether the agent was being paid the highest possible commission rate, and Wraith admitted that no matter how closely Edwards scrutinized his LBL records, he would not have been able to detect or confirm that LBL had given Weber and Liberda a higher commission rate.

Because LBL operated in such a manner so as to conceal the true facts from Edwards regarding the preferential commission rates the company paid to Liberda and Weber, only LBL knew the full factual picture regarding these rates, and Edwards had no practical way to ascertain the correctness of the rumors he had heard. *Central States Resources Corp. v. First Nat'l Bank,* 243 Neb. 538, 546, 501 N.W.2d 271, 276–77 (1993) ("no one making an examination of the bank's books without special knowledge could have known that money had been collected on the [participation] loan" such that purchaser of loan participation certificate should have known that the lead bank's successor in interest had repudiated its agency by applying the funds solely to its own account).

Therefore, even if the "discovery rule" applies, as LBL argues, Edwards did not discover, nor could he have discovered in the exercise of reasonable diligence, his cause of action regarding preferential commission rates during his agency relationship with LBL, which did not end until February 1995.

## V. CONCLUSION

Therefore, I conclude that because there was an agency relationship between Edwards and LBL, the statutes of limitation cited by LBL, Neb.Rev.Stat. §§ 25–205 & 25–206 (Michie 1995), did not begin to run on Edwards' counterclaim until February 1995, the month in which Edwards' demand for an accounting was refused and in which LBL terminated the contractual relationship between it and Edwards.

Further, even if the "discovery rule" applies, as LBL argues, Edwards did not discover, nor could he have discovered in the exercise of reasonable diligence, his cause of action regarding preferential commission rates during his agency relationship with LBL, which did not terminate until February 1995.

Therefore, Edwards' counterclaim, asserted in his answer and amended answer in June 1995 and September 1995, respectively, is not barred by the statutes of limitation, Neb.Rev.Stat. §§ 25–205 or 25–206 (Michie 1995).

Accordingly,

IT IS ORDERED that judgment shall be entered by separate document as follows: "There being no just reason for delay, judgment pursuant to Federal Rule of Civil Procedure 54(b) is entered in favor of Defendant Robert R. Edwards and against Plaintiff Lincoln Benefit Life Company on the issue of the statute of limitations."

### JUDGMENT

There being no just reason for delay, judgment pursuant to Federal Rule of Civil Procedure 54(b) is entered in favor of Defendant Robert R. Edwards and against Plaintiff Lincoln Benefit Life Company on the issue of the statute of limitations.