# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 99-1980/2245

_____

Lincoln Benefit Life Company,     \*
Nebraska Domestic Insurance     \*
Corporation,     \*
    \*
       Appellant/Cross-Appellee,   \*   Appeals from the United States
    \*   District Court for the District
    v.     \*   of Nebraska.
    \*
Robert R. Edwards,     \*     [PUBLISHED]
    \*
       Appellee/Cross-Appellant.   \*

_____

Submitted: September 11, 2000

Filed: March 15, 2001

_____

Before BEAM, HEANEY, and JOHN R. GIBSON, Circuit Judges.

_____

PER CURIAM.

These cross-appeals arise from a dispute between an insurance company and its former agent over amounts due under several contracts. We affirm.

Robert R. Edwards began working for Lincoln Benefit Life ("LBL") in December 1980 as a general agent. LBL agents earned commissions based on a percentage of the first year premium on any new business written. Those responsible for overseeing agents earned "overwriting commissions" on new business written by

agents subordinate to them. LBL did not require agents to await a subscriber's entire first year's payment before drawing the commission. Rather, once a new subscriber filed a completed application, underwent any required medical exam, and paid the first month's premium, LBL would advance an agent the entire commission. Should a subscriber later permit a policy to lapse, the agent had to repay the advance.

In 1982, Edwards entered into a "Marketing Director Agreement" ("MDA") with LBL wherein he agreed to meet with, recruit, train and provide support for agents in return for overwriting commissions and bonuses. LBL retained the ultimate right to approve or disapprove of Edwards' hiring selections. Agents subordinate to Edwards submitted insurance applications directly to LBL, which would then process and return them directly to the agent. The MDA's "tie-in" clause prohibited adjustments to any marketing director's commission rate without a corresponding adjustment for all other marketing directors. Under the MDA, Edwards accepted responsibility for any debts incurred by his subordinate agents. The MDA remained in effect until Edwards' termination.

Among Edwards' agent-recruits was Don Clark. Clark defrauded LBL by altering the premium rate reflected on new applications he submitted, thus artificially inflating the premium he could claim as an advance. During this period, LBL frequently waived its own rules governing advances, permitting them without complete applications, medical exams or payment of the first month's premium. As agents submitted applications directly to LBL, Edwards had opportunity to discover neither Clark's malfeasance nor LBL's waivers. LBL subsequently found itself unable to collect Clark's fictitious premiums and held Edwards responsible under the MDA.

LBL first notified Edwards of the irregularities in 1983 when Gene Wraith, LBL vice-president overseeing marketing directors, estimated Edwards' debt at $107,000. LBL did not raise the issue again until February 1985 when Wraith suggested that the two discuss the outstanding debt. No such discussion occurred until March 1986.

In March 1986, Edwards met with LBL officials to discuss his indebtedness. On March 7, 1986, he signed an "Indebtedness Agreement" (the "Agreement") whereby he acknowledged responsibility for $433,100.72 plus interest in subagent debts. LBL attributed the increase in amount between 1983 and 1986 to interest on the debt, but Edwards has never been informed what portion of the various debt statements constituted principal or interest. Edwards agreed to pay off the debt in monthly installments by 1989. Under the Agreement, LBL promised to assist Edwards with his payments by increasing his commission rates. These increased amounts were not to be actually paid to Edwards, but rather were to be retained by LBL and credited against his debt balance. LBL also agreed to assign Edwards additional agents. Wraith assured Edwards that these changes would permit satisfaction of the debt without actual cost to him. Wraith further told Edwards that failure to sign the Agreement would result in his termination. Edwards signed the Agreement because of this threat.

Pursuant to the Agreement, LBL reassigned 110 agents to Edwards, and credited him with increased commissions until 1991. In 1987, the parties entered an addendum to the Indebtedness Agreement by which Edwards would pay LBL $2,755 for 120 months, after which LBL would deem the debt satisfied in full. LBL later suspended these payments. At trial, the parties stipulated that from March 1, 1986, through March 31, 1998, a total of $255,713.77 in "payments [by Edwards] and credits" was applied to the debt. LBL never informed Edwards how much additional money was generated by the increased commissions. By the time litigation began, LBL asserted that Edwards owed it $1,066,596.88.

In July 1985, Edwards and LBL also entered a "Continuing Compensation Addendum" ("CCA") under which LBL agreed to continue to pay Edwards commissions following his leaving LBL under specified conditions. The CCA also contained a no-compete clause under which payments ceased if Edwards became a

competitor of LBL. LBL has never made any payments under this agreement, and at trial contested only the amount due.

In late 1984 or early 1985, LBL decided to change marketing strategies, away from the marketing director system to a "life brokerage distribution system." This model envisioned brokerage agencies that did not personally solicit business, but rather recruited and managed large numbers of agents. This undertaking would involve marketing campaigns, travel and expertise and would require significant financial resources. The demands expected to be placed on brokerage agents exceeded those placed on marketing directors. LBL ultimately replaced all MDA contracts except Edwards' with "Master Brokerage Agency" ("MBA") contracts. LBL did not alter Edwards' contract for fear of upsetting the terms of the Indebtedness Agreement.

In 1994, Edwards made a formal request for an accounting. Effective March 31, 1995, LBL terminated Edwards' contracts. Following Edwards' termination, LBL filed an action for declaratory judgment in Nebraska state court alleging Edwards owed it $452,558.29 under the various agreements. Edwards removed the action to federal court and counterclaimed. Edwards asserted: (1) LBL breached the MDA "tie-in" clause by paying Weber and Liberda higher rates of commission than Edwards; (2) LBL breached an oral agreement to assign all of its agents in the Dallas-Fort Worth area to Edwards; (3) the 1986 Indebtedness Agreement should be rescinded as induced by fraud and coercion; (4) LBL breached the CCA by not making any payments under it, and; (5) LBL violated an implied covenant of good faith and fair dealing in the CCA.

In 1997, the district court rejected LBL's statute of limitations defense. Lincoln Benefit Life Co. v. Edwards, 966 F. Supp. 911 (D. Neb. 1997). We affirmed. Lincoln Benefit Life Co. v. Edwards, 160 F.3d 415 (8th Cir. 1998).

After a bench trial, the district court rejected LBL's claim that Edwards owed it money. The court found that the MDA made Edwards liable only for his agents' debts

accrued within the contract terms. Accordingly, he was not responsible for debts incurred when LBL waived the contractual limitations on advances. The district court ruled for LBL on Edwards' first, second and fifth counter-claims. On Edwards' third claim, the court rescinded the Indebtedness Agreement as induced by fraud and coercion, and awarded Edwards restitution of the $255,713.77 stipulated as paid and credited towards the debt plus pre- and post-judgment interest. The district court refused to award LBL an offset for any amounts it paid or credited to Edwards under the Agreement. On Edwards' fourth claim, the court awarded him $37,325.35 under the CCA.

LBL appeals both the district court's refusal to award it an offset and also the award of prejudgment interest. On cross-appeal, Edwards challenges the dismissal of his first cross-claim, claims entitlement to a larger award under the CCA and reasserts his dismissed tort claim.

## LBL's Claims on Appeal

### A.    Rescission and Offset

The district court found that LBL induced Edwards' signature on the Indebtedness Agreement by fraud and coercion. The court consequently rescinded the Agreement, and ordered LBL to pay Edwards the $255,713.77 stipulated as paid and credited towards the debt. The district court rejected LBL's claim for an offset, ruling "LBL cannot now claim an offset for what was, in effect, the 'bait' LBL dangled to fraudulently induce Edwards to sign the Agreement. Put simply, LBL cannot recoup the costs of its fraudulent scheme." On appeal, LBL argues the court erred by not awarding it an offset for amounts it paid or credited to Edwards under the Agreement.

We review a district court's application of state law de novo. Salve Regina Coll. v. Russell, 499 U.S. 225, 239 (1991); Sioux City Foundry Co. v. South Sioux City, 968

F.2d 777, 779 (8th Cir. 1992). We review a district court's denial of equitable relief for abuse of discretion. Foy v. Klapmeier, 992 F.2d 774, 779 (8th Cir. 1993). We review the district court's findings of fact for clear error. Fed. R. Civ. P. 52.

Nebraska's law of Rescission is clear. This equitable remedy dissolves and renders a written agreement a nullity. Haumont v. Security State Bank, 374 N.W.2d 2, 7 (Neb. 1985). Rescission requires "a judicial effort to place the contractual parties in, as nearly as possible, substantially the same condition which existed when the contract was entered." Kracl v. Loseke, 461 N.W.2d 67, 76 (Neb. 1990). In ordering Rescission, a court must require all parties to return whatever they gained under the rescinded document. Gnuse v. Garrett, 261 N.W. 143, 144 (Neb. 1935).

Under the Agreement, Edwards agreed to make payments to LBL, and LBL agreed to increase Edwards' income by raising his commission rates and assigning him additional agents. The Agreement required LBL to classify those increased commissions as income to Edwards, but then to retain them and to credit them directly against his debt. To the extent that LBL followed the Agreement and credited these amounts against Edwards' account, they amount at best to an accounting procedure and cannot entitle LBL to an offset. Rescission requires the return of all benefits actually conferred. As Edwards never received these amounts, they did not confer a benefit on him. Moreover, as the district court found that Edwards did not in fact owe any debt under the Agreement, due to LBL's fraud, the reduction in Edwards' then outstanding debt also does not constitute a benefit conferred. LBL may not have an offset for any such credited amounts.

The analysis does not end here. When rescinding a real estate contract it is clear that the benefits to be returned include the property, the purchase price, and the rental value of the property for the time that it was occupied by the buyers. Equitable rescission in the field of insurance sales is more complex. It is impossible for LBL to return all benefits it received as a result of its fraudulent contract with Edwards. LBL

earned the monthly premiums that accrued as a result of the policies that were sold by Edwards' subagents; it cannot "unsubscribe" the policies that were purchased under Edwards' supervision. LBL still benefits from the rescinded fraudulent contract because it continues to collect premiums from Edwards' subscribers. The rescission of the contract is imperfect in this case, and results in LBL's enrichment in spite of the court's attempt to place the parties in their pre-contractual positions.

A court of equity has inherent power to restore justice between contracting parties. The court below explained that "[b]ecause the remedy of rescission is aimed at returning parties to a contract to the status quo, it involves not only the cancellation of the contract, but also 'a judicial effort to place the contractual parties in, as nearly as possible, substantially the same condition which existed when the contract was entered.'" (citing Kracl, 461 N.W.2d at 76). The court awarded Edwards with the stipulated amount of $255,713.77 to restore him to the status quo; we believe that this judgment counterbalances LBL's unjust enrichment earned by the premiums generated under Edwards' supervision, and subsequently affirm.

## B.    Pre-Judgment Interest

The district court awarded Edwards pre-judgment interest under Nebraska statutes 45-103.02(2) and 45-104. LBL argues that Edwards' right to recover and the amount in controversy were both reasonably contested during the litigation, and that Edwards may therefore not recover pre-judgment interest.

State law governs whether a diversity litigant may recover pre-judgment interest. Tarnavsky v. Tarnavsky, 147 F.3d 674, 679 (8th Cir. 1998). In Nebraska, interest accrues on the unpaid balance of any liquidated claim from the date the cause of action arose through the date of judgment only when "no reasonable controversy [exists] as to either plaintiff's right to recover or as to the amount of such recovery." Lange Indus. v. Hallam Grain Co., 507 N.W.2d 465, 477 (Neb. 1993); see also NEB. REV. STAT. §

45-103.02(2). The mere contesting of the amount of or right to recovery does not alone create a reasonable controversy. See A.G.A. Inc. v. First Nat'l Bank, 474 N.W.2d 655, 658 (Neb. 1991); Wiebe Constr. Co. v. School Dist. of Millard, 255 N.W.2d 413, 416-17 (Neb. 1977). Rather, the challenge asserted must be reasonable. Id. This inquiry requires an exercise of discretion by the district court. Lackawanna Leather Co. v. Martin & Stewart, Ltd., 730 F.2d 1197, 1204 (8th Cir. 1984). While we review the determination of the applicable statutory rate of interest de novo, Society Nat'l Bank v. Parsow P'ship, Ltd, 122 F.3d 574, 577 (8th Cir. 1997), we review the decision whether to award interest for abuse of discretion. Id. at 576. Thus, we review the district court's decision to award interest under section 45-103.02(2) for abuse of discretion.

The certainty of Edwards' right to recover requires an evaluation of the merits of LBL's defense. Nebraska case law demonstrates the subjective nature of this inquiry. Pre-judgment interest has been inappropriate in disputes over genuinely ambiguous contractual language, Lange Indus., 507 N.W.2d at 477 (disputing whether a contractor had substantially performed under a contract), areas of unsettled law, Blue Tee Corp. v. CDI Contractors, Inc., 529 N.W.2d 16, 21 (Neb. 1995) (disputing whether party was a materialman or a sub-contractor), and in cases where resolution was possible only after the district court exercised its fact-finding discretion. Daubman v. CBS Real Estate Co., 580 N.W.2d 552, 561 (Neb. 1998) (withholding pre-judgment interest where an agent's ambiguous conduct was held to violate fiduciary duties). However, where the issue is reasonably clear, even the most spirited opposition has not precluded recovery of pre-judgment interest. A.G.A. Inc., 474 N.W.2d at 658 (holding that a bank had no reasonable argument to avoid liability under a clearly stated escrow agreement). These cases all necessarily required an exercise of judgment.

Edwards sought restitution of the payments he made under the Indebtedness Agreement. LBL interposed that the evidence raised a reasonable dispute as to whether Edwards' actually owed a debt. The district court found that but for LBL's fraud and

coercion, Edwards would never have signed the contract. We seriously doubt whether a document procured by trickery and threat creates grounds for a reasonable dispute as to the plaintiff's right to recovery. See, e.g., Fletcher v. Mathew, 448 N.W.2d 576 (Neb. 1989) (finding no reasonable defense where defendant defrauded elderly client into transferring assets to his name despite court's having to resolve a disputed legal question); Society Nat'l Bank, 122 F.3d at 576 (noting that "[i]nterest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness"); Vogt v. Town & Country Realty of Lincoln, 231 N.W.2d 496 (Neb. 1975) (awarding pre-judgment interest where real estate agent violated fiduciary duties by participating in fraud).[1] LBL raised no reasonable defense to Edwards' right to recover.

In order to recover prejudgment interest the amount sought must also be reasonably certain. A reasonably certain amount may be calculated by the trial court without resort to "opinion and discretion in the factfinding process." Lange Indus., 507 N.W.2d at 477. Examples of such include "promises to pay a fixed sum, claims for money had and received, claims for money paid out, and claims for goods or services to be paid for at an agreed rate." Lackawanna Leather, 730 F.2d at 1204 (citing Abbot v. Abbott, 195 N.W.2d 204, 209 (Neb. 1972)). The evidence must "furnish[] data which, if believed, makes it possible to compute the amount with exactness, without reliance on opinion or discretion." Fletcher, 448 N.W.2d at 583 (quotation omitted). An asserted right to an offset does not render an amount unliquidated. Wiebe Constr. Co., 255 N.W.2d at 417. Where the parties stipulate to an amount, it may be considered reasonably certain. Id.

---

[1]That the losing party engaged in wrongdoing does not by itself justify an award of pre-judgment interest. See Yonker Constr. Co. v. Western Contracting Corp., 935 F.2d 936, 941-42 (8th Cir. 1991). Rather, such conduct may diminish the reasonableness of that party's asserted defense.

The parties stipulated at trial to the $255,713.77 ultimately awarded. Edwards is entitled to the $37, 325.35 for payments due under the Continuing Compensation Addendum dated July 10, 1985, for calendar years 1995, 1996, and 1997.

**Edwards' Claims on Cross-Appeal**

**A.      The Marketing Director Agreement**

Edwards first challenges the district court's finding that LBL did not violate the "tie-in" clause when it paid Weber and Liberda higher commission rates than those paid to Edwards. The district court found that LBL did not do so because the higher payments were made pursuant to Weber's and Liberda's Marketing Brokerage Agent contracts. We review for clear error. Fed. R. Civ. P. 52(a); Moore v. Novak, 146 F.3d 531, 534 (8th Cir. 1998). We may reverse the district court only if left with "the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). Led to no such conviction, we affirm.

The "tie-in" clause forbade the alteration of any marketing director's commission rates without a similar amendment for all other marketing directors. However, in 1985, LBL entered an oral agreement with Leroy Liberda and Tony Weber, both marketing directors, to pay them at a higher commission rate. The district court found that "[w]hile not intended to be in writing, the Brokerage Marketing Director contracts with Weber and Liberda . . . are an accurate written statement of confidential oral agreements between Weber, Liberda and Bernard Eugene Wraith." Moreover, the district court pointed to evidence suggesting that the two did not receive any increased commission rates until 1985, the year that the BMD's were signed. The court found that commission payments made pursuant to the substantially different BMD contract did not violate Edwards' MDA.

Edwards directs us to two pieces of testimony. First, he points to Wraith's testimony that his oral agreements with Weber and Liberda concerned only higher commission payments and did not include the remaining provisions included in the BMD contracts. From this, he would have us conclude that the two were wholly unrelated. Second, he points to testimony from Fred Jonske, a former president and CEO of LBL, to the effect that the BMDs did not take effect until 1986, after the increased commission rates commenced.

The record reflects, though, that Wraith fully intended to relate the boosted commission rates to LBL's transition to the brokerage-based market system. He testified that the payments were "[t]o help them make the transition to this new distribution system and to also to [sic] enlist their support in speaking positively about the proposed changes to the existing field force." Moreover, "the arrangement I made with [Weber and Liberda] had nothing to do with their marketing director's contract." In addition, Jonske testified that LBL embarked on the brokerage marketing strategy in 1985. He detailed the "skill set" required for this undertaking, and explained why in his opinion Weber and Liberda had it, while Edwards did not. Finally, he explained why this effort would require additional startup capital, to be funded by the increased commission rates.

The district court found that the MDA did not foreclose LBL's ability to create new marketing systems, and to enter different contracts at higher rates of commission with other agents. Edwards does not challenge these findings. Our review of counsel's arguments and the record leave us of the opinion that the district court did not commit clear error in finding that the payments made to Weber and Liberda did not violate Edwards' MDA.

## B.    The Continuing Compensation Addendum

Our resolution of Edwards' first argument moots his claim for additional compensation under the CCA. Accordingly, we find that the district court did not commit clear error in its calculation of Edwards' compensation due under the CCA.

## C.    The Tort of Violation of an Implied Covenant of Good Faith and Fair Dealing

Finally, Edwards appeals the district court's ruling that Nebraska law does not and would not recognize a tort claim for the violation of an implied covenant of good faith and fair dealing. The tort Edwards alleges arises out of LBL's failure to pay him anything under the CCA. In the district court, LBL did not contest liability under this contract, but did contest the amount owed. Edwards argues that in refusing to pay him at all, LBL acted in bad faith and urges this court to hold that the Supreme Court of Nebraska would, if presented with the question, recognize such a tort claim. We decline the invitation.

Again, this court reviews the district court's application of state law de novo. Salve Regina College, 499 U.S. at 231. When presented with a question of state law, upon which the state's highest court has not yet ruled, the onus falls to this court to determine what that court would do, were it presented with the question. Lindsay Mfg. Co. v. Hartford Accident & Indem. Co., 118 F.3d 1263, 1267-68 (8th Cir. 1997).

Nebraska presently recognizes a tort claim for the violation of an implied duty of good faith and fair dealing in only two cases–third-party and first-party claims against insurance companies.[2] See Braesch v. Union Ins. Co., 464 N.W.2d 769 (Neb.

---

[2]Nebraska recognizes a covenant of good faith and fair dealing in every contract. Strategic Staff Mgmt., Inc. v. Roseland, No. S-99-1043, 2000 WL 1678012, at *6 (Neb. Nov. 9, 2000). Breach of such a covenant affords a contract remedy. Here, Edwards sues not in contract but in tort.

1991) (first-party suit by insured); <u>Olson v. Union Fire Ins. Co.</u>, 118 N.W.2d 318 (Neb. 1962) (third-party suit by accident victim). Accident victims and insured parties may sue insurance companies to recover damage awards in excess of policy limits where the insurance company previously refused in bad faith to settle at the policy limits. <u>Id.</u> These causes of action are anchored in the insurer's obligation to act in "good faith where the rights of an insured are concerned." <u>Olson</u>, 118 N.W.2d at 321. Edwards exhorts this court to find that were the Nebraska Supreme Court faced with the facts of his case, it would extend <u>Braesch</u> to permit him to sue LBL in tort for its alleged bad faith refusal to pay him under the CCA.

In expanding <u>Olson</u> to permit a first-party suit in <u>Braesch</u>, the Nebraska Supreme Court recognized the potential for a flood of contract-based tort suits. To avoid this result, the court narrowly tailored its holding and took great care to limit its tort to insurance contracts. It distinguished insurance contracts as being of particular public interest, as incorporating some non-commercial interests, and as being particularly subject to bargaining inequities.[3] <u>Braesch</u>, 464 N.W.2d at 774-76.

Because the Nebraska Supreme Court took such care to limit its tort to insurance contracts, the <u>Braesch</u> opinion simply does not provide a sufficient basis to expand the

---

[3]Edwards argues that he satisfies <u>Braesch</u> in part because he entered the CCA not only for financial gain but also for peace and security in retirement. This, he argues, parallels the non-commercial notions discussed in <u>Braesch</u>. With careful lawyering, however, this argument might well apply to any contract. Every contract is entered into for peace of mind and security. Contracts establish ground rules to govern parties' future conduct and interaction. They attempt to pre-empt disputes, to plow ground not yet reached, and to establish principles for approaching anticipated or unanticipated problems. Edwards bargained for certain compensation in return for certain services. As LBL failed to pay him under that contract, contract law will enforce the deal and give him the benefit of his bargain. But contract law will do no more. Although he denies it, Edwards' argument does in fact represent the first crack in the floodgates that the <u>Braesch</u> court sought to keep closed.

realm of Nebraska tort law litigatable in federal court. Accordingly, we hold that the Nebraska Supreme Court, if faced with this question, would not permit Edwards' claim.

BEAM, Circuit Judge, dissenting in part.

I dissent from the court's conclusion regarding the district court's award to Edwards, because neither Nebraska law nor the record support it.

As the court's citations make clear, even if fraud is involved, Nebraska recission law requires each party to return the benefits of the rescinded bargain. In order to understand the problem, one must first understand the Agreement's scheme. Pursuant to the Agreement, LBL provided Edwards with higher commission rates and assigned additional sub-agents. Edwards, in return, promised to repay his alleged debt to LBL out of his increased income. The Agreement did not affect the premiums paid by policyholders to LBL. Rather, it allocated to Edwards a larger slice of those premiums. On its books, LBL registered that larger slice as income to Edwards, but rather than pay it out to him, simply retained it and credited it against his purported debt. As the district court's recission order makes clear, Edwards never actually owed LBL that debt. Therefore, amounts credited against the debt by LBL did not actually confer a benefit on Edwards. Had the Agreement never existed, those increased amounts, treated as income to Edwards under the Agreement, would have flowed directly to LBL.

Given this scheme, the court correctly denies LBL restitution of any amounts it credited towards Edwards' debt, as those amounts do not represent a benefit conferred upon Edwards by LBL. The court then takes up the district court's $255,713.77 award to Edwards. As to that amount, the district court found:

> The parties have stipulated that $255,713.77 in "payments [by Edwards] and credits" have been made towards the indebtedness owed to LBL from

-14-

> March 1, 1986, to March 31, 1998. Only "credits" to Edwards' indebtedness - as opposed by [sic] payments by Edwards - were made after September of 1991 because LBL agreed to "put the payments in limbo until [Edwards] could accumulate enough agents to kind of offset that . . . compensation that [LBL] took away from [him].

(quoting trial record) (brackets in original). This language makes clear that the $255,713.77 consists only partially of payments made by Edwards to LBL, and also partially of amounts credited by LBL against Edwards' debt. Edwards certainly deserves restitution of the former amounts, as they constitute monies that but for the Agreement would have been his. But the credits are a different story. Absent the Agreement, monies credited by LBL against Edwards' debt would have belonged to LBL. Therefore, these credits do not constitute a benefit conferred on LBL by Edwards under the Agreement, and should not be given to him as recission restitution.

The district court made no effort to parse the stipulated amount to determine the proper award of recission restitution required by Nebraska law. The district court failed to do so because it erroneously used the finding of fraud to support its approach to the judgment entered. In order to sustain the district court's award, and to avoid dealing with this error of law, the court fabricates benefits that LBL purportedly received by virtue of the Agreement. The court assumes that absent the Agreement, Edwards would have attracted less new insurance business for LBL, or that agents reassigned to him would have sold fewer LBL insurance policies. There is absolutely no support for this assumption. This new approach is simply designed to support the result reached by the court even as it ignores established Nebraska precedent. Indeed, neither the record, Nebraska case law, nor common sense supports the court's premise. Because LBL would have received all the policy premiums anyway, such amounts should not be included in any recission calculus.

-15-

The court's resolution unnecessarily clouds Nebraska law. Under its logic, any contract could be argued to contain unquantifiable intangibles that can be used to form the basis of a recission judgment. The court claims that Nebraska precedent is based upon real estate contract law and not the more complex world of insurance sales. But one can correctly argue that recission of a real estate agreement would not return goodwill built up in the use of the property, mental anguish over a contract's demise, or any number of other purported "benefits."

Rather than contort Nebraska law to sustain the district court's award on appeal, I would simply remand the damages question to the district court for determination of what portion of the $255,713.77 constitutes payments by Edwards to LBL, and what portion represents credits from LBL against the debt.[4] This is what Nebraska law clearly requires.

On this point I dissent, but am otherwise happy to concur in a concisely reasoned opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[4]This outcome would also require the district court to revisit its pre-judgment interest ruling.