CENTRAL STATES RESOURCES, CORP., AN IOWA CORPORATION,
APPELLANT, V. FIRST NATIONAL BANK IN MORRILL, NEBRASKA,
APPELLEE.

501 N.W.2d 271

Filed June 4, 1993.    No. S-90-1124.

Paul A. Zoss, of Adams, Howe & Zoss, P.C., for appellant.

Richard A. Douglas, of Nichols, Douglas and Kelly, P.C., for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, FAHRNBRUCH, and LANPHIER, JJ.

HASTINGS, C.J.

Central States Resources, Corp. (Central States), appeals the judgment dismissing its cause of action as to count VII entered by the district court following a bifurcated trial on the applicability of the statute of limitations.

On January 5, 1983, the Bank of Gering (Gering) purchased from Minatare State Bank (Minatare) a $227,000 participation in loans of $327,300 which were made by Minatare to Harlan Deines on January 4, 1983. A participation agreement involves a lead bank which makes a loan and sells a portion of it to another bank. First National Bank in Morrill (FNBM) is the successor in interest of Minatare, which held Deines' loan.

This participation agreement involved two notes, the first in the principal amount of $88,000, evidenced by note No. 17067, dated May 27, 1982, and the second evidenced by note No. 17441, dated December 4, 1982, which was made in the amount of $239,300. The terms of the participation agreement provide that all advantages derived from the loans or any security therefor shall be shared ratably in the proportion which its unpaid respective participations bear to the entire face amount. The participation certificate executed by Minatare certified to

Gering as follows:

> Undersigned warrants the validity of all said notes and guarantees all signatures thereon and the validity of the Truth-In-Lending Disclosure Statement; and knows of no defect therein or defense thereto. Undersigned elects the same as a note or notes under any guaranties applicable thereto and confirms that all payments of interest, all advantages derived from the above or any security pledged therefor, including the exercise of any banker's lien or right of setoff, shall be shared in such manner that each bank shall share such payments and advantages ratably in the proportion which its unpaid respective participations in this loan shall bear to the entire unpaid amount of the loan. All payments of principal and expenses of collection shall be shared in the same manner.

Gering State Company was the holding company, owned and operated by H.L. McKibbin and his wife and son, which held more than 80 percent of the outstanding stock of Gering, as well as over 80 percent of Minatare.

Gering was closed and placed into a Federal Deposit Insurance Corporation (FDIC) receivership on July 31, 1986. On April 20, 1988, Central States purchased the loan participation certificate at issue from FDIC. The petition, filed by Central States against FNBM on June 5, 1989, followed by a later-filed amended petition, prayed for an accounting and an order requiring FNBM to pay Central States a share of the payments received by Minatare on the loan.

FNBM's answer alleged as an affirmative defense that Central States' claim was barred by the applicable statute of limitations, which Central States denied in its reply. The trial court heard only the issue of the statute of limitations as provided by Neb. Rev. Stat. § 25-221 (Reissue 1989). That section provides that any party may move that the issue of the bar of the statute of limitations be tried separately. The court held that the cause of action listed in count VII was barred by the applicable statute of limitations. Neb. Rev. Stat. § 25-205 (Reissue 1989) provides for a bar of 5 years on an agreement in writing. The action was ordered dismissed. Following a denied application for new trial, Central States appeals. The primary

question before this court is whether Central States' cause of action had accrued prior to June 5, 1984, and whether it is barred.

Central States assigns as error the ruling of the district court (1) that the cause of action accrued when the sale proceeds were received by Minatare, rather than when the proceeds were applied to the note, and by inference, the court's failure to apply the appropriate statute of limitations, and (2) that the claim for a share of a "beet check," a money order purchased by Deines and payable to Minatare, had accrued prior to June 5, 1984.

Deines filed for bankruptcy on June 10, 1983. Following the November 15, 1983, discharge from bankruptcy, the Deines farm was sold for $67,536.50 by means of an auction on February 18, 1984. The proceeds were placed in a separate account in Minatare entitled "Harlan Deines Farm Sale," and a separate ledger was used to record the payment of sale expenses. The sale resulted in net proceeds of $45,683.04 after deducting the value of another person's property also included in the sale, as well as various sale expenses. The net proceeds eventually were applied to the note of Deines held by Minatare.

McKibbin, former president and board member of both Gering and Minatare, testified that upon receipt of the funds, the normal procedure in the payment of participation funds consisted of the loan officer's dividing the proceeds according to the participation agreement. When asked whether he had made demand upon Minatare to receive any of these sale proceeds, he stated that he "didn't personally make any demand, I really wasn't up on the account. The loan officers were handling it and it didn't come to my attention."

Gary Kelley, vice president of Gering during the incidents at issue here, also served both on the board of directors and as administrative vice president at Minatare for the final 6 or 7 months of 1985, then as president of Minatare from January 1986 until January 1989, when Minatare merged with FNBM. Kelley testified that as an officer of Gering, he assisted Minatare's employee who officially acted as clerk for the Deines auction and was aware of the fact that money was received by Minatare on the sale. He admitted that he made no demand for

proceeds of that particular sale.

It is the contention of FNBM that the net proceeds of $45,083.04 remaining in the "Harlan Deines Farm Sale" account as of April 24, 1984, were on that date applied to the note. This claim is supported by exhibit 119, which is on letterhead of Minatare, is dated April 24, 1984, and contains a breakdown of the various items in the Deines account along with the notation that the net proceeds were applied to the note. Additionally, McKibbin testified as follows: "Q. Does that show—a bank record show that that's applied to the note? A. It says here applied to note, 45,683.04, that closed the account out." McKibbin also testified that he did not think any of those funds were paid to Gering. Kelley testified that he did not know why all of the "$45,000" was applied to Morrill's debt and none to Gering's.

Central States asserts that the proceeds were not actually applied to the loan until May 1985, after all other expenses arising from the Deines sale had been paid, and it further alleges that Gering had no right to demand the money until Minatare had paid itself by applying the proceeds to the indebtedness.

Exhibit 105 is a four-page document entitled "Harlan Deines 109-136," which appears to be ledger sheets relating to this loan or, as testified to by McKibbin, "just a recap of the results of the account." The first entry was made on March 2, 1978, and thereafter follow various debits and credits entered in handwriting through September 6, 1983, showing a balance of $326,178.06 as of that date. There then appear, in typewriting, chargeoffs to Gering of $32,000, $97,500, and $97,500, dated, respectively, December 1, 1983; August 10, 1984; and May 6, 1985. Chargeoffs to Minatare appear as $20,000 and $33,495, made on January 2, 1984, and December 31, 1984, respectively, leaving a balance due of $45,683.06. McKibbin disclaimed any knowledge of these latter entries, testifying that "I never saw this before. Before yesterday, I mean."

The final entry on exhibit 105, also entered in typewriting, shows "5-23-85 Applied proceeds from Harlan Deines Farm Sale account, credit $45,683.06, balance 0." McKibbin agreed that exhibit 105 was Minatare's "real bank account record of the Deines account . . . where the bank would actually record

payments and advances on that line of credit" and that the ledger showed that the $45,683 stayed in the farm sale account until May 23, 1985.

In addition, a balance of $47,705.09 was carried on Minatare's monthly statements of the "Harlan Deines Farm Sale" account until the May 31, 1985, statement, on which a deposit of $3,000 was shown to have been made on May 7, and on which checks issued for $45,683.06 on May 13 and $5,022.03 on May 24 reduced the account to a zero balance.

Additionally, exhibit 121A is a photocopy of a check dated April 24, 1984, in the amount of $45,683.06, drawn on Minatare and payable to Minatare. McKibbin testified that the bank's records reflect that the check for $45,683.04, dated April 24, 1984, was applied to the note the same date the check was drawn and that since there was no "clearing bank," the funds belonged to the bank when the negotiable instrument was received.

However, the other part of exhibit 121A is entitled "Commercial Loan Note Payment," with the account name of Harlan Deines, showing a credit of $45,683.06, and with handwriting stating "Paid from Farm Sale Acct." The date shown is May 23, with the year missing, the extreme right-hand side of the copy apparently having been eliminated in the photocopying process.

Also paid on the indebtedness to Minatare to the credit of Deines was the sum of $10,200.01, represented by a money order drawn on Minatare, payable to Minatare, and purchased by Deines with proceeds of his beet check. Minatare had a perfected security interest in Deines' beet crop, as evidenced by the financing statement and security agreement in the record. According to the testimony of McKibbin, this money order was issued by Minatare on September 1, 1983.

Central States accurately contends that the record discloses that the proceeds of the beet check represented by the bank money order were not actually and specifically applied to Deines' note until June 12, 1985. By way of further explanation, exhibit 124 consists of a photocopy showing a bank money order register No. 5503, dated September 1, 1983, purchased by Deines, payable to Minatare, in the face amount

of $10,200.01; official check debit No. 5503, dated June 12, 1985, disclosing that it was to replace lost or destroyed check No. 5503; and a credit account, "Reserve For Bad Debts," dated June 12, 1985, for "Partial Recovery Harlan Deines, $10,200.01."

It is readily apparent that the funds represented by the Deines farm sale and the proceeds of the beet check were received by FNBM in some form more than 5 years before the filing of this action on June 5, 1989, although neither item was specifically applied to Deines' note account with Minatare until later dates, each within the 5-year period.

The point at which a statute of limitations begins to run must be determined from the facts of each case, and the decision of the district court on the issue of statute of limitations normally will not be set aside by an appellate court unless clearly wrong. *Frezell v. Iwersen*, 231 Neb. 365, 436 N.W.2d 194 (1989); *McCook Equity Exch. v. Cooperative Serv. Co.*, 230 Neb. 758, 433 N.W.2d 509 (1988). However, when reviewing a question of law, an appellate court is obliged to reach a conclusion independent of the trial court's rulings. *L.J. Vontz Constr. Co. v. City of Alliance, ante* p. 334, 500 N.W.2d 173 (1993).

A participated loan results in the sale of a designated percentage of the loan to the participating bank with the lead bank acting as the participant's agent to collect and forward the appropriate repayments and to service the loan, but the participant does not acquire full legal title to the loan and attendant documents; such title rests in the lead bank. *Northern Bank v. Federal Dep. Ins. Corp.*, 242 Neb. 591, 496 N.W.2d 459 (1993). In such case, a constructive trust is imposed upon one who has acquired legal title to property under such circumstances that one may not in good conscience retain the beneficial interest in the property; in that situation, equity converts the legal titleholder into a trustee holding the title for the benefit of those entitled to the ownership thereof. *Northern Bank v. Federal Dep. Ins. Corp., supra.* Under a participation agreement, a "downstream" bank is akin to an assignee of a promissory note who stands in the shoes of the assignor and obtains the right, title, and interest that the assignor had at the time of the assignment. Therefore, as an assignee of FDIC,

Central States obtained FDIC's right to assert that claim in a court of law. See *Thweatt v. Jackson*, 838 S.W.2d 725 (Tex. App. 1992). See, also, *Federal Deposit Insurance Corp. v. Bledsoe*, 61 U.S.L.W. 2662 (U.S. May 11, 1993) (No. 92-1575). This court has held that when an agent is specifically appointed to collect money and remit it to the principal after deducting his or her charges, no time having been stated when the remittance is to be made, the statute of limitations begins to run in favor of the agent from the time such agent receives the money. Mere silence or concealment by the agent without affirmative misrepresentation will not toll the statute. *Campbell v. Roe*, 32 Neb. 345, 49 N.W. 452 (1891). See *Whatley v. National Bank of Commerce*, 555 S.W.2d 500 (Tex. Civ. App. 1977). See, also, *Spann v. First Nat. Bank of Montgomery*, 240 Ala. 539, 200 So. 554 (1941); *Tabata v. Murane*, 24 Cal. 2d 221, 148 P.2d 605 (1944); *Moran v. Schlosberg*, 90 F.2d 408, 67 App. D.C. 163 (1937); *Davenport v. Townsend*, 117 Mont. 75, 157 P.2d 477 (1945); *Jones v. Vanstory*, 200 N.C. 582, 157 S.E. 867 (1931). The duty to pay loan participants arises when proceeds are derived from the participating loan. See *Federal Deposit Ins. Corp. v. Mademoiselle of California*, 379 F.2d 660 (9th Cir. 1967). However, where there is a general or continuing agency, a statute of limitations does not commence to run until the agency is terminated, so that unless the death of one of the parties occurs, the termination of a continuing agency cannot be effective so as to set the statute in motion until an accounting is had or a demand for an accounting made and refused, or there is an express repudiation of agency communicated to the principal. *Grindey v. Smith*, 237 Iowa 227, 21 N.W.2d 465 (1946). A cause of action accrues when the aggrieved party has the right to institute and maintain suit. *Hoffman v. Reinke Mfg. Co.*, 227 Neb. 66, 416 N.W.2d 216 (1987); *Lake v. Piper, Jaffray & Hopwood Inc.*, 219 Neb. 731, 365 N.W.2d 838 (1985).

Applying the foregoing principles to the facts of this case, we conclude that the trial court was clearly wrong in counting the running of the statute of limitations, § 25-205, from the time FNBM first received the funds. See, *Frezell v. Iwersen, supra*; *Campbell v. Roe, supra*. Until FNBM actually closed the "Harlan Deines Farm Sale" account and dedicated the funds as

a credit on the Deines loan, no one making an examination of the bank's books without special knowledge could have known that money had been collected on the Deines loan. It was at that point at the earliest, May 28, 1985, that Central States would have been expected to know that FNBM had repudiated its agency by applying the funds solely to its own account. In the same manner, the proceeds from the beet check were not identified to the Deines loan account until a replacement money order had been issued on June 12, 1985.

As a result, the statute of limitations did not begin to run until May 23, 1985, approximately 4 years 1 month before this action was brought.

There is yet another reason why the Nebraska statute of limitations is not effective in this case.

Central States has taken the position that if the statute of limitations has run on its claim under Nebraska law, the claim continues to survive under the 6-year statute of limitations applicable to FDIC and its assignee under federal law. See 12 U.S.C. § 1821(d)(14) (Supp. I 1989), which reads as follows:

(A) . . .

Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by [FDIC] as conservator or receiver shall be—

(i) in the case of any contract claim, the longer of—

(I) the 6-year period beginning on the date the claim accrues; or

(II) the period applicable under State law. . . .

. . . .

(B) . . .

For purposes of subparagraph (A), the date on which the statute of limitation begins to run on any claim described in such subparagraph shall be the later of—

(i) the date of the appointment of [FDIC] as conservator or receiver; or

(ii) the date on which the cause of action accrues.

The Court of Appeals of Texas held in *Thweatt v. Jackson*, 838 S.W.2d 725 (Tex. App. 1992), that Thweatt, by virtue of the fact that he purchased a note from FDIC, became vested with the same rights that FDIC had in the note under both state and

federal law. The court reasoned that the 6-year statute of limitations available to FDIC was also applicable to Thweatt as a transferee. Although § 1821(d)(14) was not enacted by Congress to become effective until August 9, 1989, the federal courts considering this issue have been nearly unanimous in giving the provision retroactive effect. *FDIC v. New Hampshire Ins. Co.*, 953 F.2d 478 (9th Cir. 1991); *Federal Deposit Ins. Corp. v. Schoenberger*, 781 F. Supp. 1155 (E.D. La. 1992); *FDIC v. Thayer Ins. Agency, Inc.*, 780 F. Supp. 745 (D. Kan. 1991); *Federal Deposit Ins. Corp. v. Bancinsure, Inc.*, 770 F. Supp. 496 (D. Minn. 1991).

Since *Thweatt, Federal Deposit Ins. Corp. v. Bledsoe*, 61 U.S.L.W. 2662 (U.S. May 11, 1993) (No. 92-1575), has been decided. Whether applying § 1821(d)(14); *Mountain States Financial Resources v. Agrawal*, 777 F. Supp. 1550 (W.D. Okla. 1991), regarding FDIC claims; or the reasoning found in the federal statute as to Federal Savings and Loan Insurance Corporation claims, the court held that the assignee of the federal agency stood in the shoes of that agency and thus received the benefits of the 6-year limitations statute.

Even assuming that *Thweatt* alters to 6 years the applicable statute of limitations in the matter before us today, FNBM argues that Nebraska law has always been that a litigant may not change the theory of recovery at the appellate level in hopes that the odds of prevailing will improve. Central States chose not to argue in the trial court for relief under the federal statute. Only § 25-205 was presented at the trial level. FNBM correctly contends that an issue not presented to or passed upon by the trial court generally is not appropriate for consideration on appeal. See, *Wagner v. City of Omaha*, 236 Neb. 843, 464 N.W.2d 175 (1991); *Hensman v. Parsons*, 235 Neb. 872, 458 N.W.2d 199 (1990); *Beaver Lake Assn. v. Sorensen*, 231 Neb. 75, 434 N.W.2d 703 (1989).

However, we are obliged to dispose of cases on the basis of the theory presented by the pleadings on which the case was tried. *Union Pacific RR. Co. v. Kaiser Ag. Chem. Co.*, 229 Neb. 160, 425 N.W.2d 872 (1988). As previously stated, FNBM's answer to Central States' amended petition merely alleged a bar of the statute of limitations. This is an affirmative

defense which must be and was raised in the pleadings. Central States in its reply simply denied that allegation. Which statute of limitations applies is a question of law that this court must decide independently of the conclusion reached by the trial court. We hold that the federal statute of limitations for FDIC, as provided by § 1821(d)(14), under which FDIC would also have possessed the right to bring a contract claim, applies to Central States as the assignee of FDIC. See *Federal Deposit Insurance Corp. v. Bledsoe, supra.* Under the federal statute of limitations, no bar is applicable whichever of the two dates is used as the accrual date of the cause of action. The judgment of the district court is reversed, and the cause is remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.