IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


COFER V. MILLER


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


GLENN COFER AND MAURINE COFER, APPELLANTS AND CROSS-APPELLEES,

V.

MARK MILLER AND ROCHELLE MILLER, HUSBAND AND WIFE, AND DELMAR MILLER AND HAZEL
MILLER, HUSBAND AND WIFE, APPELLEES AND CROSS-APPELLANTS.


Filed January 17, 2023.    No. A-21-823.


Appeal from the District Court for Lincoln County: MICHAEL E. PICCOLO, Judge. Affirmed
as modified.

Timothy P. Brouillette, of Brouillette, Dugan, Troshynski & Bellew, P.C., L.L.O., for
appellants and cross-appellees.

Lindsay E. Pedersen, Attorney at Law, P.C., L.L.O., for appellees and cross-appellants.


PIRTLE, Chief Judge, and RIEDMANN and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Glenn Cofer and Maurine Cofer (the Cofers) entered into a lease agreement in 1997 with
Mark Miller and Rochelle Miller, and Delmar Miller and Hazel Miller (collectively referred to as
the Millers), wherein the Millers leased certain cattle, pasture, and cropland from the Cofers. The
parties ended their lease agreement at the end of 2019, and the Cofers subsequently filed a
complaint against the Millers for breach of contract and replevin; the replevin action related to a
pivot engine on the leased cropland. The Lincoln County District Court found that the Cofers'
complaint sufficiently raised both a replevin and a conversion action regarding the pivot engine.
Following a bench trial, the district court entered a net judgment of $14,679.49 in favor of the

- 1 -

Cofers on the breach of contract action but found that their replevin and conversion actions were time-barred by the statute of limitations.

On appeal, the Cofers and the Millers both challenge the amount of the judgment awarded to the Cofers. The Cofers also challenge the district court's finding that their other claims were time-barred. We affirm as modified.

## II. BACKGROUND

As relevant to this appeal, the lease covered cattle, pastureland, and a pivot on cropland.

### 1. WRITTEN LEASE AGREEMENT

The lease agreement entered into on April 30, 1997, stated in relevant part:

Lessors: Glenn and Maurine Cofer, Husband and Wife and Lessees: Mark and Rochelle Miller, Husband and Wife, and Lessees Delmar and Hazel Miller, Husband and Wife.

It is agreed that this will be a year to year lease. If one or the other party does not want to continue this lease, they must notify the other party no later than September 1 of the current year. Lessee agrees to lease from Lessor 117 head of cross bred stock cattle with Lessor's brand ["C" above "→"] on the left hip. Lessee shall take possession of said livestock on November 1st, 1997. During the term of this agreement, Lessee agrees to take custody of said livestock, to properly breed, graze, pasture, feed, maintain and care for the same and to raise the calves produced therefrom.

Lessee shall return all cattle provided by Lessor under this agreement to Lessor's premises . . . at the termination of this agreement, at the expense of the Lessee.

The Lessee will have the option of culling any unproductive cows which are open, broken mouthed, bad eyes or do not produce a good calf. Any problem cattle may be culled by mutual agreement of the Lessee and Lessor. These problem cattle shall be returned to Lessor or delivered to the sale barn of Lessor's choice at Lessee's expense.

. . . .

The Lessee shall receive seventy percent (70%), and the Lessor thirty percent (30%) of the calf crop each, as standing calves at the time said calves are weaned from the cows. Unless otherwise mutually agreed, the Lessee agrees to deliver the Lessor's share of the calves to the sale barn of Lessor's choice at the time of weaning at Lessee's expense.

. . . .

Lessee shall pay all trucking expenses, veterinary expenses, feed expenses, salt and mineral expenses and all other expenses necessary to properly breed, graze, pasture feed and maintain, care for and raise said livestock.

. . . .

Replacement heifers shall be retained in sufficient numbers to maintain the present heard. Lessee shall pick the best heifers each year to keep as replacement heifers. These heifers will be deducted from the Lessor's share of the calves. Lessee will receive one hundred (100%) of the first born calves of the first calf heifers, from thereon, the calves will be divided in the usual manner, seventy (70%) Lessee, thirty percent (30%) Lessor.

Lessor agrees to pay the cost of pregnancy checking the cows in the fall of 1997.

. . . .

Lessee agrees to rent pasture for said livestock described as Section 9-15-30 and Section 4-16-31 and ¼ of Section 5-16-31 and 350 acres of pasture in Section 28-15-30, all located within Lincoln County, Nebraska. Lessee agrees that this land shall be grazed for a [5½] month period during the growing season of each year at the rate of fifty (50) head of cows and calves per section of land. . . . The pasture rent shall be paid ½ on May 1st of each year, and ½ on November 15th of each year beginning May 1st, 1998. It is agreed that the rent shall be negotiated each year.

. . . .

Crop Land

Lessee agrees to rent from lessor one hundred thirty (130) acres of crop land under a pivot irrigator located in Section 28-15-30, Lincoln, County, Nebraska. . . . Lessor agrees to maintain the pivot irrigator in good operating condition to provide water on the crop as needed. The Lessor shall pay all cost of repair and maintenance on the pivot irrigator. Lessee agrees to pay all operation costs of the pivot irrigator, such as fuel and oil. . . .

. . . .

The lease continued, with some slight modifications, until it was terminated in December 2019.

### 2. PLEADINGS

On February 6, 2020, the Cofers filed a complaint against the Millers. The Cofers' first cause of action was for breach of contract and tortious conversion, wherein they alleged that they terminated the lease agreement on or about October 30, 2019, and that the lease provided that replacement heifers would be retained in sufficient numbers "to maintain the present herd." The Cofers claimed the Millers did not maintain the present herd, returning only 93 cows, and thus there was a deficit of 24 cows under the lease (total cows originally leased was 117). The Cofers claimed damages of $28,800 ($1,200 × 24 cows) for the reduced herd. They further claimed that of the 93 cows returned by the Millers, 11 were "dry cows" (not pregnant) rather than bred cows and thus worth only $742.52 each rather that $1,200 each for a total loss of $5,032.28. They also claimed the Millers failed to pay $11,788.21 in rent for 2019. The Cofers' sought a total of $45,620.49 in damages on their first cause of action. The Cofers' second cause of action was for "[r]eplevin," wherein they alleged that the Millers "wrongfully detained" the Cofers' 1975 3304 Caterpillar American Made 125 hp engine. The Cofers sought the return of the engine or the value thereof if it was not returned.

In their answers, the Millers generally denied the Cofers' claims. Additionally, the Millers raised the affirmative defenses of laches, waiver, equitable estoppel, and unclean hands. In their amended answer, Mark Miller and Rochelle Miller additionally alleged that they were owed money which should be set off against any amount owed by them.

### 3. TRIAL

A bench trial was held on April 28, 2021. Only Maurine Cofer and Mark Miller testified. Several exhibits were received into evidence, including a copy of the parties' April 1997 lease agreement which was set forth in relevant part earlier in this opinion.

Maurine Cofer testified that she was raised on a ranch, and she had been cattle ranching with her husband since 1956 or 1957. They also owned pasture ground and farm ground in Lincoln County. Mark Miller testified that he was born and raised on a farm and ranch, had been farming and ranching on his own since 1983, and owned cattle and property of his own.

In 1997, the Cofers put an ad in the paper stating that they were interested in leasing their cows. The Millers, who had sold bulls to the Cofers over the years, responded to the ad. The Cofers and the Millers entered into a lease agreement in 1997, wherein the Millers leased 117 cattle, pastureland, and cropland from the Cofers. The year-to-year lease agreement underwent certain undisputed modifications since 1997. For example, in 1997, the Millers paid $22 per month per cow/calf pair for pasture rent, but the price increased over the years until the Millers were paying $45 per cow/calf pair. And the cropland was initially leased for a specific dollar amount of rent but was subsequently modified to a guaranteed bushel of corn per acre.

### (a) Cattle, Pasture Rent, and Related Expenses

The Cofers and the Millers operated under the lease agreement for many years without incident. However, in the process of terminating the agreement, there was disagreement regarding how many cows should have been returned and whether the cows that were returned qualified entirely as the Cofers' herd or whether some were separately maintained for the Cofers' daughter. Additionally, there was an issue as to whether the lease required the returned cows to all have been bred (pregnant) or if some of the cows could be "open" or "dry" (not pregnant). The Cofers expected 117 bred cows to be returned to them since that was what the Millers received at the commencement of the lease. The Millers contended the Cofers had intentionally reduced the herd, and that their daughter's cows should have counted towards the 117 cows they were obligated to return. Further, the Millers did not interpret the lease to require the returned cows to be bred. The evidence pertinent to those opposing claims follows.

Maurine testified that each year, Mark discussed with the Cofers which cows should be culled, and he had to have her permission to cull them. She said a "cull cow" is "usually . . . an old cow that is not bred," but can be "a young cow, if the cow is not a good producer." Cull cows are "usually sold for butcher," and are worth less than bred cows.

Mark testified that in 2011 and 2012, the Cofer herd was downsized because of a drought. The cows were culled with the Cofers' permission, and he was instructed to sell all of the replacement heifers for those years. When asked to explain the difference between a cow and a heifer, Mark stated that a heifer has never had a calf.

In 2013, the Cofers' daughter, Glenna Brissey (Brissey), wanted to get into the cattle business and bought 20 head of cattle from Mark. According to Maurine, Mark had a verbal, not written, agreement with Brissey, and he leased the cows Brissey bought from him and took a share of Brissey's calves just as he had done with the Cofers. Maurine stated that Mark helped Brissey increase her number of head. Maurine testified that Brissey's cattle carried the Cofers' brand—because Mark "didn't want to mix too many brands . . . for him to keep track of"—but Brissey's cattle were not the Cofers' cattle, and Mark always treated them separately.

Mark testified that he was asked to brand Brissey's cows separately, but he insisted on branding Brissey's cattle with the Cofers' brand ("C" above "→") because he "was not going to have four or five different brands out here." He did use a separate color of ear tag for the Brissey

- 4 -

cattle, listed the Brissey cattle separately on spreadsheets, and sent checks to Brissey when he sold calves because he "was asked to do that." Mark "[did not] know the agreement that [Brissey] had with her parents," but he did not treat Brissey's cattle separate from his agreement with the Cofers. He considered Brissey's cattle part of the "C-Arrow" brand cows under the 1997 lease. Mark testified, "The one thing that I made sure it was understood there [sic] would be no more cattle with the C-Arrow brand than what they had grass for," and in 2013, there was not enough grass for 117 cows plus another 20; "In 2013 they had enough grass for 120, -25 head depending on the year."

Maurine testified that from 1997 until 2018, the amount due for pasture rent by the Millers was decided by the parties each year. She said, "Mark would come to our house and we would figure up the number of days that the cattle had been in the pasture," "and at a certain price per day for a unit," and "[w]e'd just agree on a price." Maurine stated that, prior to 2019, there was never a time that the Cofers paid the Millers for pasture nor did the Cofers pay for feed, salt, or mineral because "according to the original lease, that was the responsibility of the lessee."

Mark testified that in 2016 and 2017, he "really started seeing [he] needed to figure out a way to either . . . get out [of] this lease or we need to redo it." In the fall of 2017, he mentioned to the Cofers that "we needed to maybe think of some different options on how to do the share lease thing on the cows, that it just with the cost of feed, pasture, it was tough to make it work." "The share cattle were not penciling out for me . . . at the 70-30 . . . agreement that we had in place," and Mark wanted to "break even."

Then, in December 2018, Mark met with the Cofers about the lease agreement. Mark testified that he told the Cofers that he was not able to keep their cows under the current agreement, that the parties would have to come up with a new lease agreement, and if they could not come to an agreement on a different lease, Mark would return all of the cows in the fall of 2019; Mark did not get a response from the Cofers. Mark stated that in January 2019, he told the Cofers that he would be selling all of the 2018 heifer calves and he asked what they wanted done with their share. Mark was told the Cofers wanted to keep their share, but did not have a place for them, so Mark offered to keep the heifers, but told the Cofers they would have to pay the feed bill for them.

According to Maurine, in December 2018, Mark told them he could no longer afford to feed the heifers, and that he was having some financial difficulties and he could not feed the replacement heifers—all of the heifer calves that were born that year. She testified that the Cofers eventually agreed to pay for 3 months for Mark to continue feeding the replacement heifers, and then the heifers were to be delivered to the Cofers. Exhibit 3 includes invoices from Mark to the Cofers dated in February, March, and April 2019, for feed, salt, and mineral. Maurine testified that she paid those invoice amounts to Mark.

Mark testified that he expected the heifers would be gone by the end of April 2019, but the heifers did not get returned in April because Maurine informed him that she did not have a place for them. Mark said he told her he could not keep them, but the parties would have to work something out. He "believe[d] through an email [he] was asked to keep the heifers at [his] place for the summer." Mark said he told Maurine he "will handle them" but "she will be responsible for the pasture rent, will be responsible for bull, salt and mineral." The heifers were later "preg checked" in September and "all . . . of them were pregnant." The Cofers had the heifers picked up in December. According to Mark, he only charged the Cofers for expenses, including salt and

mineral, related to the 14 replacement heifers; he did not charge them expenses for all of the cows. He also charged them pasture rent for the 14 heifers beginning April 27 at the rate of $1.50 per day, which he claimed was on the "low" end compared to other rental agreements. Additionally, Mark testified that there were "open" or "dry" cows (not going to calve) the prior year that the Cofers did not want sold, so he also charged them pasture rent for those cows.

There was no dispute in the testimony that the Millers owed a total of $26,296.50 in pasture rent for 2019, and that $10,800 had already been paid for the first half of the year in June. However, there were issues when it came time to settle the second half of the 2019 pasture rent. The accounting generated by Mark and given to the Cofers (exhibit 5) showed the following.

$26,296.50 [total 2019 pasture rent]
- $10,800.00 1st payment 6-3-19
-     2673.00 Pasture Rent 9 dry cows 198 [days] @ $1.50
-     3348.29 Invoices Paid by Mark Miller
-      260.05 Salt & Mineral for bred hfrs.
-     4410.00 Pasture Rent 14 bred hfrs 210 day[s] @ $1.50
$   4805.16
-      360.00 [pasture rent 14 bred hfrs after 11-27-19]
$   4445.16 [balance for second half 2019 pasture rent]

The accounting notes that the $4,410 for pasture rent for the 14 bred heifers was for 210 days from April 27 to November 27, 2019; the $360 was for the increased cost of pasture rent for those same heifers for 10 days between November 27 and December 7 because Mark "started feeding hay." According to Mark's calculations, the total amount he owed the Cofers for the second half of the 2019 pasture rent, after adjustments, was $4,445.16. He sent a check in that amount to the Cofers in December 2019, but they did not cash the check.

Maurine testified that she did not agree with the credit amounts indicated in Mark's accounting because he "was charging us pasture rent for dry cows," "invoices such as some ear tags, some salt and mineral, incidentals of that sort." Maurine agreed that, for purposes of this action, she would give Mark a credit for the $3,348.29 of invoices he paid for repairs, but she did not agree with the other credits included by Mark. She believed that it was Mark's responsibility to care for the cattle until the lease ended at the end of 2019 "[b]ecause we had never cancelled any lease with him at all," "[a]nd I did notify him of that on several occasions by phone and also by email."

Mark testified that under the terms of the lease, he had "an obligation to return everything with a C-Arrow brand on it" to the Cofers. He said that he returned 117 cows (92 Cofer + 25 Brissey) and 14 heifers (11 Cofer + 3 Brissey). Those cattle are reflected in exhibit 10, Mark's spreadsheet for 2019, which listed the ages and ear tag numbers for the Cofer and Brissey cattle. Exhibit 10 also notes that eight of the cows were "fall bred" cows (7 Cofer + 1 Brissey). Mark testified that those cows did not calve in the spring and "needed to have been sold, unproductive," but he was asked not to sell them and to breed them for fall; Mark wanted to cull those cows but was instructed not to. Mark also testified that the 14 replacement heifers that went back to the Cofers at the end of the lease were "bred heifers" at that time.

Mark testified that he was "even" on the 117 cows. He explained that he kept his share of the 2019 calf crop because those were calves that were carried in 2018 and born in 2019. However, the cows were returned in November 2019, so he did not keep any of the calf crop born in 2020. As for the 14 replacement heifers from 2019, he did not keep any of the calves from their first calf crop, which is why he believed he was entitled to a setoff for the salt and mineral costs and pasture rent for those 14 heifers. He "had told the Cofers that [he] was not going to keep their cows after the 2019 season" and he "did not believe it was [his] responsibility to keep the heifers"; the Cofers did not want them back at their place, so Mark offered to keep them "at their expense."

Maurine testified that in 1997, the 117 head of cattle "were all bred cows." She said that a "bred cow is one that produces a calf." According to her, when the lease ended in 2019, Mark only returned 93 cows, a deficit of 24 cows. Of the 93 cows returned, 11 were "dry" and could only be sold as a "culled cow." The Cofers sold those 11 cows for an average of $742.52 per head. They sold the other cattle to a third party for $1,200 each, the going rate for bred cows. The Cofers were seeking $28,800 in damages for the 24-cow deficit (24 × $1,200). There were also seeking $5,032.28 in damages for the dry cows, specifically the cost difference between the cost of a bred cow and a dry cow ($1,200 – $742.52 = $457.48 cost difference; $457.48 × 11).

(b) Pivot Engine

At the time of the 1997 lease agreement, there was a pivot on the cropland rented by the Millers, and the pivot had a 1975 3304 Caterpillar 125 horsepower engine. Pursuant to the lease agreement, the Millers were to pay the costs of operating the pivot and to maintain the pivot in good operating condition, but the Cofers were to pay repair costs for the pivot.

Mark testified that in 2013, the Millers had "a lot of problems keeping the [pivot] motor running" and he "made [the Cofers] aware of it." Mark said that the motor was using a lot of oil and they "couldn't keep oil in it"; it was "[u]sing oil, spitting it out," and the "head gasket was leaking." Mark had to check on the engine four times per day, and "then it would usually shut itself down at night." That winter, Mark suggested that the Cofers replace the motor, but that was not something they were willing to do. Mark then suggested that the motor be taken off and inspected to see what the repair costs would be; the Cofers were agreeable to that suggestion. Mark had the motor inspected in 2014 and learned the cost to repair it meant "basically you were going to buy a new engine, a new head, new block." He told the Cofers what he found out and they started discussing options as rebuilding the engine was not something either party wanted to do. Mark was "told that [the Cofers] didn't have money to repair it or buy a new [or used] [motor]," so Mark offered to buy a motor, which is what ended up happening prior to the 2014 growing season. Mark said he paid $23,000 for the replacement motor. Mark had discussions "mainly with Glenn" about what to do with the old motor, whether Mark "needed to bring it back up there or what he wanted done." When "[Glenn] asked what it was worth," Mark responded, "All I know is what I was told," "[i]t was nothing but salvage and probably just go to an iron buyer." Mark testified, "What I recall Glenn saying was, [w]hatever money was received for the old motor, just to go ahead and use that money to help with the cost of removing the old one and setting the new one down." Mark said he received $450 from the 1975 Caterpillar motor for scrap and offered to give that money to the Cofers, but "Glenn had told me just to use it to help with the cost of changing them out."

Maurine testified that the pivot was still on the land at the time of trial, but the 1975 Caterpillar engine was not. She "was not aware that [Mark] had removed it from the property." She also said that when Mark told her he was going to put another engine on the pivot, she objected, but he told her the engine was going to be hers. When asked when she first found out the engine was gone, Maurine replied, "Not for several months," "probably three, or four, five months later that I discovered that." Upon further questioning, Maurine stated that she did not know the engine was gone until "this year" (2021), but then said "[w]ell, it was in the winter, I think last winter"; she agreed that she knew the engine was gone prior to filing the lawsuit in February 2020. After stating she knew "last winter," she then stated, "It was not the first time I knew that he had removed it" "because I had asked him before what he had done with the engine" and "he at that time said he had traded it in"; Maurine thought Mark said he got around $600 for the engine on trade in. When the lease was terminated in 2019, the Cofers no longer had a working engine in the pivot, the new renter "brought his own engine" because the Cofers "did not have an engine to put in there." When asked if she knew what the value of the 1975 engine would have been at the termination of the Millers' lease, Maurine replied "it was $6,900 due to the fact that I saw one of exact [sic] same thing advertised for that."

## 4. DISTRICT COURT'S DECISION

The district court entered its order on May 18, 2021. The court found that the Cofers had abandoned their position regarding tortious conversion at the time of trial "since no evidence was presented on this issue."

In the breach of contract action, the district court found that the Brissey cattle operation was separate from the Cofer lease, thus the Brissey cattle were deemed to be owned exclusively by Brissey and were excluded from consideration. The court then found that, pursuant to the lease, the Millers were obligated to return 117 cows but only returned 103 (92 cows and 11 heifers). The evidence established that a bred cow was worth $1,200, so the court entered a judgment in favor of the Cofers for $16,800 for the 14-cow deficit (14 cows at $1,200 per head). The court also found that the Millers were contractually obligated to return bred cows to the Cofers, and that 11 of the 92 cows returned were "open or dry" cows. Because the Cofers received a net average of $742.52 for each of the 11 "cull cows" sold, the court found that the difference between the cost of a bred cow and an open or dry cow was $457.48 ($1,200 − $742.52). The court then entered a judgment in favor of the Cofers for $5,032.28 for the 11 dry cows (11 cows × $457.48). The court also determined that the Millers owed a balance of $15,496.50 for the 2019 pasture rent and entered judgment against them accordingly. The total judgment in favor of the Cofers was $37,328.78.

However, the district court found that the Millers were entitled to certain setoffs, including $3,348.29 for bills and expenses that Maurine agreed to pay at trial; $3,465 for pasture rent for 11 cows/heifers that Maurine agreed to pay; $260 for salt and mineral for the 11 cows/heifers; and $2,376 for pasture rent for the 8 dry cows Mark suggested be culled and sold in early 2019 but that the Cofers instructed him to keep (8 dry cows × $1.50 per day × 198 days). The total setoff amounted to $9,449.29.

The net judgment in favor the Cofers was $27,879.49, and the district court entered judgment against the Millers accordingly.

In the second cause of action, the district court said it would "consider that [the Cofers] sufficiently raised both a replevin action and a conversion action." However, because both replevin and conversion actions have a 4-year statute of limitations, the Cofers were time-barred because their 2020 action was filed 6 years after the 2014 sale of the engine.

On May 27, 2021, the Millers filed a motion to alter or amend or, in the alternative, a motion for new trial; they filed an amended motion on July 12. The Millers alleged that the district court erred in treating the Brissey cattle separately when they had the Cofer brand; not finding that the lease was modified when the Cofers culled additional cattle in 2012; not giving them a setoff for 100 percent of the first-born calves of the Cofers' first calf heifers that were returned prior to the first calf crop; and finding that the lease agreement provided that the cows were guaranteed to be bred. The Millers allege that the net judgment in favor of the Cofers should have been $6,047.21 ($15,496.50 for 2019 pasture rent − $9,449.29 setoff).

Following a hearing, the district court entered an order on September 21, 2021, partially sustaining the Millers' motion. The court found that under the parties' agreement, the Millers were entitled to 100 percent of the first calf crop from any replacement heifers that were kept and incorporated into the Cofers' herd. The court then noted that the 11 Cofer replacement heifers became pregnant, were eventually picked up from the Millers in the fall or early winter of 2019, and then ultimately sold by the Cofers to a third party along with the rest of their herd. The court "[concurred] with the [Millers] that they were entitled to 100% of the first calve [sic] crop from . . . the 11 heifers that were returned to the Cofers," resulting in an additional setoff of $13,200 (11 × $1,200). The court modified and adjusted the judgment in favor of the Cofers to $14,679.49 and entered judgment against the Millers accordingly.

The Cofers appeal and the Millers cross-appeal.

### III. ASSIGNMENTS OF ERROR

The Cofers assign, reordered, that the district court erred in (1) applying the written and oral agreements to the facts and damages/setoff claimed by both parties, (2) determining that the number of cows returned to them by the Millers was 103 rather than 93, (3) determining the amount of pasture rent the Millers were entitled to as a setoff against the Cofers' judgment for the Cofers' 8 dry cows and the Cofers' 11 heifers, (4) determining that the Millers were entitled to a setoff against the Cofers' judgment for the Millers' future unborn calf crop and the value thereof, (5) determining that the Millers were entitled to a calf crop setoff when it also imposed a pasture rent and salt and mineral setoff for those same Cofer 11 pregnant heifers, and (6) determining that the statute of limitations barred the Cofers from recovering the pivot engine or its equivalent value.

The Millers assign on cross-appeal that the district court erred (1) in finding that they returned less than 131 cross-bred stock cattle with the Cofers' brand, or in the alternative, by not finding a modification of the 1997 written lease with regard to the number of cows to be returned to the Cofers at the termination of the lease; (2) in finding that the cows were required to be bred when returned to the Cofers at the termination of the lease; and (3) by not finding that the Cofers were estopped from claiming damages for the reduced number of cows returned to them.

## IV. STANDARD OF REVIEW

A suit for damages arising from a breach of contract presents an action at law. *Dietzel Enters. v. J. A. Wever Constr.*, 312 Neb. 426, 979 N.W.2d 517 (2022).

In a bench trial of a law action, a trial court's factual findings have the effect of a jury verdict and will not be set aside on appeal unless clearly wrong. *Id.* After a bench trial of a law action, an appellate court does not reweigh evidence, but considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party. *Id.*

The amount of damages to be awarded is a determination solely for the fact finder, and its action in this respect will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to the elements of the damages proved. *Id.* With respect to damages, an appellate court reviews the trial court's factual findings under a clearly erroneous standard of review. *Pan v. IOC Realty Specialist*, 301 Neb. 256, 918 N.W.2d 273 (2018).

Actions for conversion and replevin are law actions. *Zelenka v. Pratte*, 300 Neb. 100, 912 N.W.2d 723 (2018).

In reviewing the district court's judgment on the issue of the statute of limitations, the findings and decision of the court will not be set aside unless clearly wrong. *Frezell v. Iwersen*, 231 Neb. 365, 436 N.W.2d 194 (1989). The point at which a statute of limitations begins to run must be determined from the facts of each case, and the decision of the district court on the issue of statute of limitations normally will not be set aside by an appellate court unless clearly wrong. *Id.* However, the determination of which statute of limitations applies in a case is a question of law and, therefore, an appellate court has an obligation to reach a conclusion independent of that of the trial court in a judgment under review. *Central States Resources v. First Nat. Bank*, 243 Neb. 538, 501 N.W.2d 271 (1993).

## V. ANALYSIS

### 1. NUMBER OF COWS RETURNED

Both the Cofers on appeal, and the Millers on cross-appeal, take issue with the district court's finding that the Millers returned 103 of the 117 cows required by the lease. The Cofers claim that only 93 cows were returned, whereas the Millers claim that 131 cows were returned.

### (a) Brissey Cattle

#### (i) Brissey Cattle Excluded

We start with the Millers' claim that they returned 131 cows. The Millers contend that the lease provided for the return of 117 cattle with the Cofers' brand, and 131 head of cattle were returned with the Cofers' brand at the termination of the lease. Included in the Millers' count are the Brissey cattle which bore the Cofers' brand. The Millers contend that "ownership of the cattle is unrelated and irrelevant to the written lease agreement" and that "the arrangements made between the family with regard to how the 131 head of C→ cattle to be [sic] divided between the family is not for the Millers or this Court to determine or decide." Brief for appellee at 19.

The district court found that "[o]ther than the cows sharing the same brand, the parties treated Brissey's cattle operation separately from the leased Cofers' cattle," and "based upon the

business practices of Mark and Brissey over 7 years," that 25 head returned by Mark "are to be excluded from consideration and are deemed to be owned exclusively by Brissey." This factual finding by the district court is not clearly wrong.

While the Brissey cattle bore the Cofers' brand, that was at Mark's insistence. Brissey was not a party to the 1997 lease, and any subsequent business arrangement between Mark and Brissey does not fall under the 1997 lease. The Brissey cattle were therefore properly excluded from consideration.

### (ii) Lease Not Modified

The Millers suggest, in the alternative, that the district court erred by not finding a modification of the 1997 written lease regarding the number of head of cows to be returned at the end of the lease. They argue,

> Cofers received the benefit of all the culled cows throughout the terms of the lease. Every time a cow was culled and taken to the sale barn, Cofers received the check for that cow. Every time a calf was not retained a replacement [sic], the Cofers received the calf check for those calves sold. Cofers have received the benefit of this alleged breach and have cashed the checks from the culled cows and sold calves.
>
>   Cofers were compensated for those deficit cows when they were culled and therefore they should not be entitled to a second bite of the apple.

Brief for appellee at 19. However, the culling of cattle and the use of replacement heifers "to maintain the present herd" was included in the terms of the 1997 lease. Though the herd number during certain drought years (2011 and 2012) may have been consciously lower than the 117 head under the lease, that did not prevent the herd size from being increased to normal numbers by the end of the lease in 2019. Mark's testimony at trial that he would not have taken on the Brissey cattle in addition to 117 Cofer cattle is not determinative; as concluded by the district court, Mark's agreement with Brissey was a separate agreement and was not to be considered. The district court's finding that 117 cattle were required to be returned was not clearly wrong.

### (iii) Cofers Not Equitably Estopped

Finally, the Millers contend that the Cofers mutually assented to the number of head and should now be equitably estopped from claiming a deficit in cows.

To impose equitable estoppel, the court must find as to the party estopped, (1) conduct which amounts to a false representation or concealment of material facts or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; (3) knowledge, actual or constructive, of the real facts; as to the other party, (4) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (5) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (6) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his or her injury, detriment, or prejudice. *Noah's Ark Processors v. UniFirst Corp.*, 310 Neb. 896, 970 N.W.2d 72 (2022).

The Millers argue, "The testimony was clear that Mrs. Cofer was aware of all the cattle that were being culled and she authorized cattle to be culled," she "agreed to modify the agreement by reducing her herd size and culling additional cows," and she "controlled the number of head of calves that were sold." Brief for appellee at 21. Therefore, the Millers "were no longer responsible to keep 117 cows." *Id.* They further argue, "Had Cofers not agreed to reduce the herd, Mr. Miller would not have agreed to handle additional cattle for Cofers' daughter," and "Mark should not now be punished for cattle that Cofers **CHOSE** TO CULL AND AGREED NOT TO REPLACE"; "[a]ny result otherwise is unjust and inequitable." *Id.* (Emphasis in original).

The district court did not specifically address equitable estoppel in its order, even though the Millers raised it as an affirmative defense. There is no indication in the record that the Cofers agreed not to replace the culled cattle. The Cofers downsized their herd in 2011 and 2012 due to a drought, but the record does not indicate that they agreed to never build back the herd size. That Mark entered into a separate cattle lease agreement with Brissey in 2013 does not impact the Millers' lease with the Cofers.

Mark also points out that exhibit 10, a 2019 list of cattle that he sent to the Cofers, showed the number of cattle they had; 92 that year plus 11 replacement heifers. He states that "[f]rom at least 2015 forward, Cofers received a written statement of the number of cows they had each year" and they "never took any action to dispute the number of head," nor did they "take any action to ask Mark to retain additional heifers in their herd." Brief for appellee at 22. While exhibit 10 showed the number of Cofer cattle for 2019 (92 cows plus 11 replacement heifers), the record does not indicate how many cattle were listed on any written statements Mark gave to the Cofers from 2015 to 2018. Additionally, the Cofers did take action to retain additional heifers as evidenced by their decision not to sell their heifers in 2019.

Based on our review of the record, there is not sufficient evidence in the record to show that the Cofers' conduct amounted to a false representation or concealment of material facts or was calculated to convey the impression that the facts were otherwise than, and inconsistent with, those which they subsequently attempted to assert. Accordingly, the Millers' equitable estoppel claim fails.

(b) Heifers Included in Count

The Cofers claim that only 93 cows were returned to them, not 103. The district court found that, based on exhibit 10, Mark's list of 2019 cattle, the actual number of cows delivered to the Cofers was 92. This finding was not clearly wrong.

The district court found that in addition to those 92 cows, there were 11 replacement heifers born in 2019 that were products of the 2018 cow/calf crop that Mark intended to sell, but that the Cofers directed him not to sell. The court found the 11 replacement heifers "were treated by the parties as the Cofers['] 30% share of that year's calf crop," and "were retained and were expected to be incorporated into the Cofers['] cattle operation." Further, "Mark was specifically directed to pasture and care for these animals until they were able to be transferred to the Cofers." The court stated, "It was later discovered that these [11] heifers were pregnant," were picked up for the Cofers, and ultimately sold as bred cows to a third party. The court found that the 11 replacement heifers should be considered in the number of cows that were returned to the Cofers, making the number of "'returned'" cattle 103; a 14-cow deficit. This finding was not clearly wrong.

The district court entered judgment in favor of the Cofers for $16,800 for the 14-cow deficit ($1,200 per cow × 14 cows).

### (c) Cattle Required to Be Bred

According to Maurine, of the 92 cows that were returned to the Cofers at the end of 2019, 11 of them were "open" or "dry" cows, which were worth less than bred cows. We note that the number of open or dry cows increased by the end of 2019 from what was reflected in the Millers' exhibit 10 from earlier in the year. Exhibit 10 indicates 8 "Fall Bred" cows, 7 belonging to the Cofers and 1 belonging to Brissey, which Mark explained were the cows that did not calve in the spring (of 2019) and needed to be sold, but he was asked not to sell them. We are unable to tell from the record whether the 11 open or dry cows returned to the Cofers at the end of 2019 consisted in whole or in part of the 8 open or dry "Fall Bred" cows for which Mark claimed he was entitled to pasture rent; regardless, we find no error in the district court's judgment in favor of the Cofers for $5,032.28 for the difference between the cost of a bred cow and the 11 open or dry cows ($457.48 per cow × 11) that were returned to the Cofers at the end of 2019.

The Millers argue that the district court erred in finding that the cows were required to be bred when returned to the Cofers at the end of the lease.

In its order, the district court stated,

> The obligations and responsibilities of the parties under the terms of their 1997 written lease agreement are relatively straightforward and unambiguous. The Cofers agreed to lease 117 cross-bred stock cattle to the Millers. At the commencement of their leasing arrangement, the 117 lease cows were all bred. The written lease unmistakably provides that at the conclusion of their leasing relationship, the Millers are required to return "all cattle" to the Cofers. Perhaps the term "all cattle" may be a bit vague and subject to interpretation. However, *based upon the unrefuted testimony of Maurine Cofer, the Millers leased 117 bred cows and it stands to reason that they are responsible to return 117 bred cows to the Cofers.*

(Emphasis supplied.)

The Millers argue, "The reference to 'cross bred stock cattle' [in the lease] does not mean that the cattle were bred when they were taken to Miller." Brief for appellee at 21. "That reference is with regard to the type of cattle involved in the lease" and "[c]ross bred cattle would be differentiated from purebred cattle." *Id.*

While it is true that the term "cross bred stock cattle" in the lease does not necessarily mean that the cattle were bred, Maurine testified that the 117 cows delivered in 1997 were "all bred cows." Thus, the district court's finding that the lease requirement to "return all cattle" meant the return of 117 bred cows was not clearly wrong.

### 2. PASTURE RENT AND SETOFFS

There is no dispute that the Millers owed a total of $26,296.50 in pasture rent for 2019, and that $10,800 had already been paid for the first half of the year in June. However, Mark claimed several setoffs against his $15,496.50 obligation for the second half of the 2019 pasture rent. The district court ultimately gave the Millers setoffs for pasture rent for 8 dry cows ($2,376), and with

regard to the 11 bred/pregnant replacement heifers the Millers received a setoff for pasture rent ($3,465), salt and mineral costs ($260), and the loss of a calf crop ($13,200). The court also gave the Millers a setoff for $3,348.29 in invoices that Maurine agreed to pay at trial.

The Cofers argue that the district court erred in determining the amount of pasture rent the Millers were entitled to as a setoff for the Cofers' 8 dry cows and the Cofers' 11 replacement heifers, the latter consisting of the Cofers' 30 percent share of the calf crop born in early 2019. The Cofers further argue that the court erred in determining that the Millers were entitled to a setoff for the value of 11 anticipated/unborn calf crop when it also imposed a pasture rent and salt and mineral setoff for the 11 heifers carrying those calves.

### (a) Setoff for Pasture Rent for 8 Dry Cows

Mark testified that the 8 cows that did not calve in the spring of 2019 "needed to be sold, unproductive," but he was asked not to sell them and to breed them for fall. He also testified that that there is a "[p]retty good chance" that a cow that was open or dry once would be open or dry again. It was undisputed that bred cows are worth more than cows that are not bred. Maurine testified that she believed that it was Mark's responsibility to care for the cattle until the lease ended at the end of 2019.

In its order, the district court found that "since Mark was unable to sell the suggested open cows and was instructed to keep them, it would seem equitable that the cost of caring and pasturing those cows be passed on to the Cofers." The court then found that Mark was entitled to a setoff of $2,376 (8 open cows × $1.50 per day × 198 days). Although there is evidence that one of those 8 open cows belonged to Brissey and therefore should not have been counted in this setoff, there was also evidence offered by Mark to suggest there were 9 open or dry cows in early 2019. The court settled on giving Mark credit for pasturing 8 open or dry cows and we cannot say that this finding is clearly wrong.

### (b) Setoff for 11 Replacement Heifers

In 2018, Mark met with the Cofers to discuss their lease. Mark testified that he told the Cofers that he was not able to keep their cows under the current lease agreement, and that if they were unable to come up with a new agreement, he would return all of the cows in the fall of 2019. In January 2019, Mark told the Cofers that he would be selling all of the heifer calves born in the pending calf crop. The Cofers did not want to sell their share of the heifer calves (born in early 2019) but they did not have a place for them. Mark offered to keep the Cofers' share of newly born heifers but told the Cofers they would have to pay the feed bill for them. Maurine testified that she agreed to pay for 3 months for Mark to continue feeding the replacement heifers, and then they would be returned to the Cofers; Maurine paid 3 months' worth of invoices for feed, salt, and mineral. After 3 months, the Cofers were unable to take possession of the heifers. Mark testified that he agreed to continue caring for the replacement heifers but told Maurine "she will be responsible for the pasture rent, will be responsible for bull, salt and mineral."

The district court found that "[t]he parties mutually agreed to keep the unsold [heifer] calves with Mark to pasture for three months after which time the calves would be delivered to the Cofers" and "[t]he parties further agreed that the cost to pasture and care for the Cofers' cattle would be paid by them." The heifer calves were sold by the Cofers to a third party in December

2019. We cannot say that the district court's factual findings and setoffs for the pasture rent, salt, and mineral for the 11 replacement heifers were clearly wrong.

While the 11 replacement heifers counted toward the 117 head that were supposed to be returned to the Cofers in 2019, it appears that the parties agreed that those 11 heifers would be returned much earlier in the year than the other cattle. The parties also agreed that the Cofers would pay the pasture and expenses for those 11 replacement heifers. Thus, the Millers were entitled to the setoffs for the pasture rent and salt and mineral for those 11 replacement heifers.

However, in response to the Millers' motion to alter or amend, the district court subsequently found that the Millers were further entitled to a setoff for their loss of a calf crop from those same 11 replacement heifers. Pursuant to the 1997 lease,

> Replacement heifers shall be retained in sufficient numbers to maintain the present heard. Lessee shall pick the best heifers each year to keep as replacement heifers. These heifers will be deducted from the Lessor's share of the calves. Lessee will receive one hundred (100%) of the first born calves of the first calf heifers, from thereon, the calves will be divided in the usual manner, seventy (70%) Lessee, thirty percent (30%) Lessor.

The district court found the 11 replacement heifers were part of the 2018 cow/calf crop and the Millers intended to sell all the heifers from that calf crop in 2019, however, the Cofers wanted to keep 11 replacement heifers (part of their 30 percent share of the newly born calves). The parties negotiated an arrangement for the Millers to keep and care for the 11 replacement heifers until they could be relocated to the Cofers' pasture. The 11 heifers later became pregnant, were picked up from the Millers in December 2019, and were ultimately sold by the Cofers to a third party along with the rest of their herd. The court found that the Millers "were entitled to 100% of the first calve [sic] crop from . . . the 11 heifers" and were entitled to an additional setoff in the amount of $13,200 ($1,200 per cow × 11 cows).

The Cofers contend that the district court erred in determining that the Millers were entitled to a setoff for the anticipated 11 unborn calves (due in 2020) and value thereof when it also imposed a pasture rent and salt and mineral setoff to compensate the Millers for taking care of the 11 replacement heifers who became pregnant with those calves. The Cofers argue that the lease agreement "remained in full force and effect for 2019 EXCEPT for [their] 11 heifers that they were entitled to as part of their 30% calf crop." Brief for appellant at 13. (Emphasis in original). They further argue that the parties entered a separate agreement in December 2018 wherein the Cofers would pay the Millers for pasture until they found a place for the heifers; those 11 heifers "were not retained" and not a part of the 117 cows leased under the 1997 agreement. However, we have already found that the district court was not clearly wrong in considering the 11 replacement heifers in the return count under the 1997 agreement. The question is whether the Millers were entitled to 100 percent of the calves anticipated to be born in 2020 to those 11 replacement heifers when the lease had ended in 2019.

The Cofers argue that the district court erred when it gave the Millers credit for the calf crop born in 2020 after the 11 replacement heifers were returned to the Cofers in 2019. At trial, Mark testified that he kept his share of the calves born in 2019 because those were calves that were carried in 2018 and born in 2019. However, he did not keep any of the calves born in 2020. As for the 14 replacement heifers from 2019 (11 Cofer and 3 Brissey), he did not keep any of the calves

from their first calf crop, which is why he believed he was entitled to a setoff for the salt and mineral costs and pasture rent for those replacement heifers.

Based on the testimony at trial, we find that the district court was clearly wrong when it gave the Millers a setoff for the unborn calves from the 11 replacement heifers. Based upon Mark's testimony, he was not expecting to keep any of the calves born in 2020 because all of the cows were returned in November 2019. Notably, the 11 pregnant replacement heifers were counted as part of the 117 bred cows the Millers were expected to return to the Cofers at the end of the lease. Mark testified that because he was not keeping the heifers' calf crop, he felt entitled to a setoff for the pasture rent, salt, and mineral costs for those 11 heifers, which the district court agreed to give him. The Cofers should not have to bear all of the 2019 expenses for the 11 replacement heifers, and then still have to give the Millers 100 percent of those heifers' calves; to do so would be unfair to the Cofers and would overcompensate the Millers. We find that the district court was clearly wrong in its September 21, 2021, order on the Millers' motion to alter or amend, when it gave the Millers a $13,200 setoff for the loss of the unborn calf crop from the 11 replacement heifers. We will modify the district court's judgment accordingly, as noted below.

### 3. JUDGMENT REGARDING COWS, PASTURE, SETOFFS

The district court ultimately found that Mark was entitled to a setoff in the following amounts.

| | |
|---|---|
| Paid Invoices [agreed to by Maurine]: | $ 3,348.29 |
| Pasture rent for 8 dry cows: | $ 2,376.00 |
| Pasture rent for 11 bred cows [heifers]: | $ 3,465.00 |
| Salt and Mineral for bred cows [heifers]: | $ 260.00 |
| Millers' loss of calf crop from 11 heifers: | $13,200.00 |
| Total Setoff: | $22,649.29 |

The district court calculated the adjusted net judgment in favor of the Cofers as follows.

| | |
|---|---|
| Judgment in Favor of Cofers for Deficit of 14 Cows: | $ 16,800.00 |
| Judgment in Favor of Cofers for 11 Open Cows: | $ 5,032.28 |
| Judgement in Favor of Cofers for Second Half of 2019 Pasture Rent: | $ 15,496.50 |
| Total Judgment Amount if Favor of Cofers: | $ 37,328.78 |
| Less: Setoff | ($ 22,649.29) |
| Net Judgment in Favor of Cofers: | $ 14,679.49 |

The district court entered judgment in favor of the Cofers and against the Millers in the amount of $14,679.49.

However, as stated previously, the district court should not have given the Millers a $13,200 setoff for the loss of the unborn calf crop from the 11 replacement heifers. Eliminating that $13,200 setoff for the heifers' unborn calf crop, the Millers were entitled to a total setoff of $9,449.29 ($22,649.29 - $13,200). Thus, the net judgment in favor of the Cofers and against the Millers should be $27,879.49 ($37,328.78 - $9,449.29), and we modify the district court's

judgment accordingly. We note that our modified judgment is the same as the district court's original judgment entered on May 18, 2021.

### 4. PIVOT ENGINE

The Cofers claim that the district court erred in determining that the statute of limitations barred them from recovering the pivot engine or its equivalent value. The Cofers argue that the Millers were not happy with the engine and complained about it during 2013. And the Cofers acknowledge that "[t]he record may also indicate that Maurine Cofer knew that Mark Miller was replacing the engine," however, the Cofers "did not know that their engine was gone or traded in by Mr. Miller until 2019 or 2020." Brief for appellant at 16.

The Cofers acknowledge that conversion and replevin share the same 4-year statute of limitations, see Neb. Rev. Stat. § 25-207 (Reissue 2016), and that a breach of contract action based on a written agreement has a 5-year statute of limitations, see Neb. Rev. Stat. § 25-205 (Reissue 2016), but claim that it "was unknown . . . that their engine was gone and could not be retrieved until around the time this action was filed" in February 2020. Brief for appellant at 16-17. Thus, the Cofers "would not only have a cause action for conversion (4 years from the date they discovered the engine was gone), but also breach of the August 1997 agreement, as the Millers failed to return the cropland in the same condition it was at the time of the agreement." *Id.* at 17.

In its order, the district court stated that the 4-year statute of limitations for either conversion or replevin "would not begin to run until Millers claimed possession of the engine or converted the engine to cash." The court then noted Mark's trial testimony. Specifically, Mark testified that after the engine inspection in 2014, Mark told Glenn Cofer that he had replaced the 1975 Caterpillar engine and that engine was only worth scrap value. Mark further testified that he was given permission from Glenn to apply the proceeds received from the sale of the 1975 engine toward the cost to install the new engine purchased by Mark. The court found that Maurine testified that she did not know that the 1975 engine was gone, but "she did admit to learning about its demise several months after it was removed." The court found that the Cofers' replevin and conversion action was filed in February 2020, 6 years after the engine was sold, and thus the Cofers' action for either replevin or conversion was time-barred. We find no clear error in the district court's findings or decision.

Although the district court did not address the Cofers' claim in terms of a breach of contract, we find that such a claim is also time-barred. The district court found that, "based upon the testimony adduced, both Glenn and Maurine knew that the [1975 Caterpillar] engine was gone and sold in 2014." The district court's findings are not clearly wrong. *Frezell v. Iwersen*, 231 Neb. 365, 436 N.W.2d 194 (1989) (in reviewing district court's judgment on issue of statute of limitations, findings and decision of court will not be set aside unless clearly wrong). Any breach of contract action in this case would have had a 5-year statute of limitations. Thus, any breach of contract action filed by the Cofers in February 2020 regarding the sale of the engine in 2014 was time-barred.

## VI. CONCLUSION

For the reasons stated above, we find that the Millers were not entitled to a $13,200 setoff for the heifers' unborn calf crop, and thus we find that the net judgment in favor of the Cofers and against the Millers should be $27,879.49. We affirm the decision of the district court as modified.

AFFIRMED AS MODIFIED.